UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANDREW PARKER and ERIC DeBRAUWERE, on
behalf of themselves and all others similarly situated,

              Plaintiffs,

        v.

TIME WARNER ENTERTAINMENT COMPANY,
L.P. and TIME WARNER CABLE, a division of Time
Warner Entertainment Company, L.P.

              Defendants.

CV 98-4265 (ILG) (JMA)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## MOTION FOR CLASS CERTIFICATION

KIRBY McINERNEY & SQUIRE LLP
830 Third Avenue
New York, New York 10022
(212) 371-6600

CUNEO WALDMAN & GILBERT LLP
317 Massachusetts Avenue, N.E.
Washington, District of Columbia 20002
(202) 789-3960

HAGENS BERMAN
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 623-7292

LAW OFFICES of JAMES M. BEAULAURIER
5600 Key Tower, 700 Fifth Avenue
Seattle, Washington 98101
(206) 340-1010

*Attorneys for Plaintiffs*

TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.   The Privacy Protections of the Cable Act . . . . . . . . . . . . . . . . . . . 5

            a.   Cable Act Privacy Notice Requirements . . . . . . . . . . . . . . . . 5

            b.   Cable Act Disclosure Protections . . . . . . . . . . . . . . . . . . . . . 6

            c.   Cable Act Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.   Time Warner's Alleged Cable Act Privacy Violations . . . . . . . . . . . . 7

            a.   Time Warner's Exploitation of Subscriber Information . . . . . 7

            b.   The Notice Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            c.   The Disclosure Violations . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   THE DEFINITION OF THE CLASS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.   The Rule 23(b)(2) Injunction Class . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.   The Rule 23(b)(3) Damages Subclass . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.   Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.   Allowing Damages in the Rule 23(b)(2) Injunction Class . . . . . . . . 17

        2.   Limiting Damages in the Rule 23(b)(3) Damages Subclass . . . . . . . 19

i

III.   PLAINTIFFS SATISFY THE THRESHOLD REQUIREMENTS
       FOR CLASS CERTIFICATION UNDER RULE 23(a) . . . . . . . . . . . . . . . . . . . . . . 19

       A.    The Class is So Numerous That Joinder is Impractical . . . . . . . . . . . . . . . . 20

       B.    There Are Common Questions of Law and Fact . . . . . . . . . . . . . . . . . . . . . . 21

       C.    The Named Plaintiffs' Claims Are Typical of the Class . . . . . . . . . . . . . . . . 22

       D.    The Named Plaintiffs Will Adequately Represent the Class . . . . . . . . . . . . 23

IV.    PLAINTIFFS SATISFY THE ADDITIONAL REQUIREMENTS
       FOR CERTIFICATION OF A RULE 23(b)(2) INJUNCTION CLASS . . . . . . . . 24

V.     PLAINTIFFS SATISFY THE ADDITIONAL REQUIREMENTS
       FOR CERTIFICATION OF A RULE 23(b)(3) DAMAGES SUBCLASS . . . . . . . . 25

       A.    Common Questions Of Law And Fact Predominate . . . . . . . . . . . . . . . . . . . 25

       B.    A Class Action Is Superior To Other Available Methods for
             the Fair and Efficient Adjudication Of The Controversy . . . . . . . . . . . . . . . 26

             1.    There is No Indication of Any Class Member Interest
                   in Individually Controlling the Prosecution of Separate Actions . . . 27

             2.    There is No Known Litigation Concerning this Controversy
                   Already Commenced by Members of the Class . . . . . . . . . . . . . . . . . 29

             3.    It Is Strongly Desirable to Concentrate the Litigation
                   in this Forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

             4.    There Are No Difficulties in Managing This Case as a Class Action  29

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

APPENDIX A

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Baby Neal v. Casey,*
    43 F. 3d 48 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Beecher v. Long Island Lighting Co.,*
    164 F.R.D. 144 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brewer v. Friedman,*
    152 F.R.D. 142 (N.D.Ill.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Consolidated Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cromer Finance Ltd. v. Berger,*
    205 F.R.D. 113 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cutler v. 65 Sec. Plan,*
    831 F. Supp. 1008 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dura-Bilt Carp. v. Chase Man. Corp.,*
    89 F.R.D. 87 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*Eisen v. Carlisle and Jacquelin,*
    417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Eisen v. Carlisle and Jacquelin,*
    391 F.2d 555 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

*Epifano v. Boardroom Business Products, Inc.,*
    130 F.R.D. 295 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Finnan v. L.F. Rothschild & Co., Inc.,*
    726 F. Supp. 460 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Haynes v. Logan Furniture Mart, Inc.,*
    503 F.2d 1161 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Henry v. Cash Today Inc.,*
    199 F.R.D. 566 (S.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Blech Securities Litigation,*
    187 F.R.D. 97 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Drexel Burnham Lambert Group, Inc.,*
    960 F.2d 285 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Lilco Sec. Litig.,*
    111 F.R.D. 663 (E.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Medical X-Ray Film Antitrust Litig.,*
    1997 U.S. Dist. LEXIS 21936 (E.D.N.Y. Dec. 10, 1997) . . . . . . . . . . . . . . . . . . . . . . . 30

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Sugar Industry Antitrust Litig.,*
    73 F.R.D. 322 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Visa Check/Mastermoney Antitrust Litigation,*
    280 F.3d 124 (2d. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mayo v. Sears Roebuck & Co.,*
    148 F.R.D. 576 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Michaels v. Ambassador Group, Inc.,*
    110 F.R.D. 84 (E.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ohman v. Kahn,*
    [1990 Tr. Binder] Fed. Sec. L. Rep. (CCH)
    95,359, 96,743 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*Parker v. Time Warner Entertainment Co., L.P., et al.,*
    1999 WL 1132463 (Nov. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Parker v. Time Warner Entertainment Co., L.P., et al.,*
    2000 U.S. Dist. LEXIS 20131 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*Parker v. Time Warner Entertainment Co., L.P., et al.,*
    198 F.R.D. 374, 2001 U.S. Dist. LEXIS 96 (E.D.N.Y. Jan. 9, 2001) . . . . . . . . . . . . . 4, 24

*Parker v. Time Warner Entertainment Co., L.P., et al.,*
    331 F.3d 13 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Phillips Petroleum Co. v. Shutts,*
　　472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Robidoux v. Celani,*
　　987 F.2d 931 (2d. Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Robinson v. Metro-North Commuter R.R.,*
　　267 F.3d 147 (2d Cir. 2001),
　　*cert. denied, Metro-North Commuter*
　　*R.R. Co. v. Robinson,* 535 U.S. 951 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Scofield v. Telecable of Overland Park, Inc.,*
　　973 F.2d 874 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sosna v. Iowa,*
　　419 U.S. 393 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Tedesco v. Mishkin,*
　　689 F.Supp. 1327 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Thonen v. McNeil-Akron Inc.,*
　　661 F. Supp. 1271 (N.D. Ohio 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Walsh v. Northrop-Grumman Corp.,*
　　162 F.R.D. 440 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## **Statutes**

Cable Communications Policy Act,
　　447 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## **Other Authorities**

H. Newberg and A. Conte, *Newberg on Class Actions*, § 21 (3d ed. 1992) . . . . . . . . . . . . . . . 25

H. Newberg and A. Conte, *Newberg on Class Actions*, § 7.17 (3d ed. 1992) . . . . . . . . . . . . . . 19

*Manual for Complex Litigation*, Part 1, § 1.43 (rev. ed. 1973) . . . . . . . . . . . . . . . . . . . . . . . . 30

Moore's Federal Practice, §23.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23

## PRELIMINARY STATEMENT[1]

Defendants Time Warner Entertainment Company, L.P. and Time Warner Cable, a division of Time Warner Entertainment Company (together referred to herein as "Defendants" or "Time Warner"), improperly have sold or disclosed the personal information of their cable subscribers, enhanced with detailed personal information obtained from other sources, to mass marketers and Time Warner affiliated companies. Defendants have engaged in this wrongful course of conduct while concealing it from subscribers and misleading them with false assurances of privacy protection. Defendants' massive violations of statutory privacy rights, under the Cable Communications Policy Act, 47 U.S.C. 551 (the "Cable Act"), have been uniform for Time Warner subscribers nation-wide, making this case particularly well-suited for class treatment.

Plaintiffs move for certification of an injunction and declaratory relief class under Rule 23(b)(2) and a damages subclass under Rule 23(b)(3). Class certification under Rule 23 is especially warranted given Defendants' common course of wrongful conduct: all Time Warner Cable subscribers in the proposed class received privacy notices that are deficient under the Cable Act in same ways; all Time Warner Cable subscribers in the proposed subclass had their personal information sold or disclosed in violation of the Cable Act in the same way. A class action suit is the only vehicle by which class members can practicably seek redress for Time Warner's misconduct in a way that will prevent massive violations of the Cable Act, provide relief to millions of class members, and send a message of deterrence to Time Warner and other cable operators.

---

[1] All documents submitted herewith are attached as exhibits to the Affidavit of Peter S. Linden ("Linden Aff.") and referenced as "Ex. __." Appendix A, which sets forth certain Time Warner subscriber list sales, is attached hereto and referenced as "App. A."

## I.     BACKGROUND

### A.     Nature of the Case

To protect the privacy of cable subscribers, the Cable Act requires cable operators, such as Time Warner Cable, to notify cable subscribers about the collection of "personally identifiable information" and the purposes for which it will use such information (referred to as the "Privacy Notice"). The Cable Act also strictly prohibits cable operators from disclosing such personal information concerning its cable subscribers under most circumstances. These privacy protections are codified in Section 551(a) (the "notice" provisions) and Section 551(c) (the "disclosure" provisions) of the Cable Act.

Plaintiffs allege Time Warner has engaged in a long-running business of selling personal subscriber information in flagrant violation of Cable Act privacy protections (the "list sales business"). Plaintiffs also allege Time Warner has engaged in a longstanding practice of issuing deceptive and deficient Privacy Notices concealing such business from subscribers, thereby depriving them of their right to object and demand privacy protection. Plaintiffs allege these wrongful practices violate Section 551 and constitute a common course of conduct that affects Time Warner Cable subscribers throughout the country. Plaintiffs have brought this action, first, to stop and prevent the wrongful practices and, second, to recover statutory damages.

### B.     Procedural History

Plaintiffs filed their original Complaint on June 16, 1998 and their Amended Complaint on November 2, 1998. Time Warner obtained a stay of all discovery in December 1998 and subsequently filed a motion to dismiss all of Plaintiffs' claims.

2

On November 8, 1999, the District Court (Judge Edward R. Korman) denied in full Time Warner's motion to dismiss. Amended Memorandum & Order, *Parker v. Time Warner Entertainment Co., L.P., et al.,* 1999 WL 1132463, at *5 (Nov. 8, 1999). Judge Korman found the subscriber information at issue constitutes "personally identifiable information" under the Cable Act and is subject to the Act's privacy protections. *See id.* at *8-12. He also upheld Plaintiffs' claim that Time Warner had violated Section 551 notice requirements by selling and disclosing subscriber information without notifying subscribers. *See id.* In doing so, he rejected Time Warner's assertion that its Privacy Notice provided clear and compliant notice. *See id.* at *18-19. Judge Korman similarly sustained Plaintiffs' disclosure violation allegations. *See id.* at *16-18.

Shortly following this decision, on December 9, 1999, Time Warner filed a motion to deny class certification as a matter of law. On January 4, 2000, Magistrate Judge Joan M. Azrack once again stayed all discovery, this time pending disposition of Time Warner's motion to deny class certification. The Magistrate Judge also precluded Plaintiffs from filing a motion for class certification to specify the class for which Plaintiffs would seek certification. On January 25, 2000, the District Court (now Senior District Judge I. Leo Glasser, the case having been transferred from Judge Korman) affirmed the Magistrate Judge's order.

On October 2, 2000, the Magistrate Judge issued a Recommendation and Report ("R & R"), 2000 U.S. Dist. LEXIS 20131 (E.D.N.Y. 2000), recommending Time Warner's motion be (i) granted "as to plaintiffs' request for monetary relief" and (ii) denied "as to injunctive or declaratory relief." The Magistrate Judge found the threshold requirements under Rule 23(a) would be easily satisfied and concluded that Rule 23(b)(2) certification should be granted for injunctive and

3

declaratory relief. However, the Magistrate Judge also recommended that certification of a damages claim under Rule 23(b)(2) and a damages class under Rule 23(b)(3) should be denied.

Plaintiffs objected to the R & R's recommendation to deny class damages under (b)(2) or (b)(3). On January 9, 2001, the District Court adopted the recommendation to limit certification solely to (b)(2) injunctive and declaratory relief. *Parker v. Time Warner Entertainment Co., L.P., et al.*, 198 F.R.D. 374, 2001 U.S. Dist. LEXIS 96 (E.D.N.Y. Jan. 9, 2001).

While preserving the right under the Court's ruling to proceed with a (b)(2) class for injunctive and declaratory relief, Plaintiffs sought Rule 23(f) interlocutory review of the denial of a (b)(2) or (b)(3) class damages claim. On September 26, 2001, the United States Court of Appeals for the Second Circuit granted Plaintiffs' petition. On June 2, 2003, the Second Circuit vacated and remanded the District Court's decision. *Parker v. Time Warner Entertainment Co., L.P., et al.*, 331 F.3d 13 (2d Cir. 2003). The Second Circuit held that the District Court's certification of a (b)(2) class for injunctive and declaratory relief but not for damages had to be reconsidered in light of *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001), *cert. denied, Metro-North Commuter R.R. Co. v. Robinson*, 535 U.S. 951 (2002), a recent decision that acknowledged the appropriateness of allowing incidental damages in a (b)(2) class action and relaxed the standard for allowing non-incidental damages in a (b)(2) class action. *See id.* at 19-21. The Second Circuit also vacated and remanded the ruling denying a damages class under (b)(3) because it rested upon legal conclusions and assumptions that did not have factual support. *See id.* at 21-22. Circuit Judge Jon Newman issued a concurrence, adding that he "believe[s] that there are strong arguments favoring a (b)(3) class." *Id.* at 23.

4

Following the Second Circuit decision, Plaintiffs were permitted only limited class discovery and were denied other discovery directly relevant to class certification.[2] The discovery ruling relied, in large part, upon Time Warner's representations of the facts, without affording Plaintiffs sufficient opportunity to test those representations through direct document discovery.[3]

This motion for class certification follows the period of limited discovery.

**C.    Facts**

**1.    The Privacy Protections of the Cable Act**

**a.    Cable Act Privacy Notice Requirements**

The Cable Act requires cable operators to provide annual notice to subscribers "clearly and conspicuously" describing: (1) the nature of personally identifiable information

---

[2] Plaintiffs were permitted discovery of list sales orders (production of which is incomplete and incoherent in many respects) and Privacy Notices, and several depositions. *See* Order of Magistrate Judge Joan M. Azrack, dated December 23, 2003, at 2-5. However, after moving to compel additional class discovery, Plaintiffs were denied discovery of Time Warner's list sales database, one of the most important pieces of evidence in this case and essential to identify the names and number of class members. *See id.* at 2-3. Plaintiffs also were denied discovery of: the "blue book" concerning the operation of the list sales business and database; the list sales practices of Time Warner Cable's local operating divisions (discovery was limited to Time Warner Cable's central corporate headquarters only); the "Focus" software program used to operate the list sales database and which can identify the names and number of class members; the "Consumer Research Database," which concerns the types and sources of personal subscriber information collected and sold and thus reveals the scope of the notice and disclosure violations; the monthly status reports of the list sales business; information regarding privacy "opt-outs," which directly bears on the size and scope of the class; and certain information regarding "enhancements" that were made to the list sales database. *See id.* at 2-5; *see also* Linden Aff., Ex. 1 (Letter dated March 29, 2004, from Landis Best to Michael Lenett).

[3] To take just one example, the Magistrate Judge's order states that the list sales database "contains general information on all of defendants' subscribers, but does not identify whose information was sold or what type of information was sold." Order dated December 23, 2003, at 2. Plaintiffs believe this statement, asserted by Time Warner, is incorrect, but have been prohibited from examining the database directly to challenge the assertion.

collected by the cable operator; (2) the use of such information; (3) the nature, frequency and purpose of any disclosure; (4) the period during which the cable operator maintains the information; (5) the times and place at which a subscriber may have access to the information; and (6) the limitations of the Cable Act protecting subscriber privacy and a subscriber's Cable Act remedies for noncompliance. 47 U.S.C. §551(a)(1). This notice requirement provides a critical procedural safeguard for subscribers' privacy rights. *See Scofield v. Telecable of Overland Park, Inc.*, 973 F.2d 874, 876 (10th Cir. 1992), *quoting* H.R.Rep. No. 934, 98th Cong., 2d Sess. 77 (1984) U.S. Code Cong. & Admin. News 1974, pp. 4655, 4714.

### b. Cable Act Disclosure Protections

The Cable Act disclosure provision, 47 U.S.C. §551(c)(1), provides "a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned . . . ." Section 551(c)(1) further requires a cable operator to "take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator." Plaintiffs allege Time Warner has violated Section 551(c) in a uniform manner nation-wide by engaging in its list sales business and allowing unauthorized access to its subscribers' protected personal information, without their knowledge or consent. Ex. 2 (Amended Complaint), at ¶¶ 55-60.

### c. Cable Act Remedies

The Cable Act authorizes subscribers whose statutory privacy rights have been violated to bring a civil action for, *inter alia*, damages of $100 per day for each day of violation or $1,000, whichever is greater, and reasonable attorneys' fees and costs. 47 U.S.C. §551(f).

6

2.     **Time Warner's Alleged Cable Act Privacy Violations**

a.     **Time Warner's Exploitation of Subscriber Information**

Time Warner is the dominant cable service provider in many urban markets, with access to the detailed personal information of millions of subscribers nation-wide. In many urban markets with poor broadcast television reception, a subscription to Time Warner's cable service is the only way to obtain local programming, compelling residents to subscribe in order to obtain local news and community programming. Ex. 2 (Amended Complaint), at ¶ 1.

Time Warner has engaged in flagrant violations of the Cable Act's privacy protections. Time Warner collects detailed personal information from subscribers throughout its nation-wide system. *Id.* at ¶¶ 4, 43; Ex. 3 (Defendants' Answer), at ¶¶ 4, 43; Ex. 4 (AR 131). Time Warner includes much of this information in its list sales database, a database of several million subscribers that it has made available for sale or other disclosure for non-cable-related purposes to telemarketers and direct mail marketers, companies selling products and services, other Time Warner affiliates and divisions, direct marketing services companies (including Metromail Corporation and Claritas), mail houses, letter shops, service bureaus, list managers and brokers, employees of Time Warner Cable engaged in the list sales business, and others. Ex. 2 (Amended Complaint), at ¶¶ 6, 9, 45, 46, 48, 60; Ex. 3 (Answer), at ¶¶ 4, 8, 46, 56, 57; Ex.5 (Deposition of John Collins), at 66-71, 79; Ex. 6 (Affidavit of Terrence Harter), at ¶¶ 4, 12, 13; Ex. 7 (Deposition of Terrence Harter), at 41, 57-58, 61-63, 73-76, 79; Ex. 4 (AR 131-33); App. A.  To increase sales, Time Warner has "enhanced" the database with personal subscriber information it has obtained from outside sources as well as from other Time Warner affiliates and divisions. Ex. 2 (Amended Complaint), at ¶¶ 4, 7, 44, 68; Ex. 3 (Answer), at ¶¶ 4, 7, 44, 68; Ex. 8 (Defendants' Responses and Objections to

7

Plaintiffs' First Set of Interrogatories), Int. #4; Ex. 5 (Collins Depo.), at 60-63; Ex. 6 (Harter Aff.), at ¶ 4; Ex. 7 (Harter Depo.), at 23, 40, 56-58; Ex. 4 (AR 24-25, 39-42, 116, 262).

Plaintiffs allege Time Warner has violated the Cable Act privacy protections in Section 551, and the violations are uniform and consistent throughout Time Warner's nation-wide cable system. The violations fall into two categories: notice violations and disclosure violations.

**b.    The Notice Violations**

Time Warner has violated the notice provisions of Section 551(a) of the Cable Act. As the Amended Complaint alleges, Time Warner has failed to clearly, conspicuously and adequately notify Time Warner's cable subscribers of: (1) the nature of all personally identifiable information collected and the nature of all uses of such information; (2) the nature, frequency, and purpose of all disclosures, including an identification of the types of persons to whom disclosures may be made; (3) the period during which such information will be maintained by Time Warner; (4) the times and places in which the subscribers may have access to such information; and (5) the limitations provided by the Act with respect to the information practices of a cable operator. Ex. 2 (Amended Complaint), at ¶ 80.

Plaintiffs allege Time Warner's Privacy Notices nation-wide are deficient in the same ways. The notices to subscribers have been uniformly deficient to alert subscribers to Time Warner's actual use and disclosure of their personal information. *Id*. at ¶¶ 62-71; *see* Ex. 9 (TW 232-37, 4779-4965). Time Warner does not "clearly and conspicuously" inform its subscribers about its use of their personal information and the Cable Act's privacy protections. Instead, Time Warner uses its Privacy Notice to conceal its privacy violations and to mislead subscribers about their Cable Act privacy rights. As a consequence of Time Warner's system-wide use of a defective and

8

deceptive Privacy Notice, its subscribers (other than named Plaintiffs) have no knowledge that their privacy rights are being violated on a massive scale.

For example, Time Warner's Privacy Notice used in New York City around the time of filing deceptively tells subscribers that Time Warner discloses to advertisers and telemarketers only each subscriber's "name, address, and the particular services to which you subscribe...." Ex. 9 (TW 232-33, 4895-96). Time Warner intentionally omits any reference to its sales of detailed subscriber profiles, including far more information than simply name, address, and services. The Notice also misleads subscribers to believe that Time Warner will protect their personal information as confidential business records. *See id*. The Notice did not clearly and conspicuously disclose that subscribers' personal information would be collected in a database, combined with specific types of personal information obtained from Time Warner affiliates and outside third parties, and made available for sale or other disclosure to affiliated companies and outside third parties for purposes unrelated to the provision of cable services.

Following the hearing with Judge Korman on Time Warner's motion to dismiss, Time Warner devised a new system-wide Privacy Notice, which continues to deceive subscribers about their privacy rights under the Cable Act and continues to violate the Act.[4] It falsely advises subscribers that Cable Act privacy protections do not apply to personal subscriber information collected from any source other than directly from the subscriber "in the course of providing cable

---

[4] Linden Aff., Ex. 10 (Affidavit of Victoria L. Miller, Exh. A, submitted with Time Warner's Motion to Deny Class Certification).

service."[5]  Judge Korman expressly rejected this interpretation of the Cable Act.  *See* 1999 WL 1132463, at \*9-11.  This still-deficient notice gives rise to continued uniform violations.

### c.    The Disclosure Violations

Time Warner has violated Section 551(c)(1) in a uniform manner with respect to its subscribers nation-wide by selling or otherwise disclosing, without subscribers' knowledge or consent, to outside parties and other Time Warner affiliates and divisions detailed personal information it collects regarding many of its subscribers.  Time Warner further violated Section 551(c)(1) in a uniform manner nation-wide by failing to take necessary actions to prevent unauthorized access to such information.  *Id.* at Ex. 2 (Amended Complaint), at ¶¶ 55-60, 74.[6]

Time Warner has collected and sold or otherwise disclosed detailed personal information about subscribers and their viewing habits.[7]  Ex. 2 (Amended Complaint), at ¶¶ 4, 7, 8,

----

[5] At the very beginning of the revised notice, Time Warner misleads its subscribers with its faulty definition of "personally identifiable information:"

This Notice pertains only to personally identifiable information about you that you have furnished to us, or that we have collected, in order that we may provide cable service to you. . . . Personally identifiable information does not include information about you that is collected other than in the course of providing cable service or that is obtained from publicly available sources.

Linden Aff., Ex. 10 (Miller Aff., Exh. A).

[6] Those who ran the list sales business were unaware of the privacy protections of the Cable Act or any Time Warner privacy protection policies.  *See* Ex. 5 (Collins Depo.), at 53-54;  Ex.11 (Olmsted Depo.), at 180-83; Ex. 7(Harter Depo.), at 38-40.

[7] Such information includes subscribers': names, addresses, ethnicity, religion, income, gender, age, birthday and birth date, presence of children in the household, age of children in the (continued...)

11, 43, 44, 46, 56, 57; Ex. 3 (Answer), at ¶¶ 4, 7, 8, 11, 43, 44, 46, 56, 57; Ex. 12 (Defendants'

Second Supplemented Responses and Objections to Plaintiffs' First Set of Interrogatories ("Second

Supp. Resp."), Ints. #3, 6, 7, 14; Ex.11 (Olmsted Depo.), at 100-03, 123; Ex. 6 (Harter Aff.), at ¶ 13;

Ex. 9 (TW 240, 241, 245, 247, 248, 249, 252, 259, 261, 263, 266, 267, 270, 275, 276, 277, 296, 297,

298, 308, 309, 312, 316, 317, 323, 330, 332, 333, 335, 355, 365, 367, 409-10, 422, 425, 426, 486,

517, 577, 593, 717, 2187, 2190, 3275; Ex. 4 (AR 39-42, 65, 116, 131-34, 180-82, 262, 350-69, 411);

App. A. Time Warner's decision to amass a database concerning personal dossiers of millions of

its subscribers was, from its inception, revenue driven. Ex. 2 (Amended Complaint), at ¶ 60; Ex. 7

(Harter Depo.), at 22-23; Ex. 6 (Harter Aff.), at ¶ 2.[8]

       For example, in August, 1996, Time Warner sold a list of the names and addresses

of all of its cable subscribers in certain zip codes who had children in the household, subscribed to

the Disney Channel, had income of $35,000 or greater, owned a home, and had purchased products

---

[7](...continued)
household, type of home, home ownership, telephone number, hobbies and interests, social and shopping habits, mail order and merchandise buying habits, telemarketing purchases, charitable donation habits, census tract and block, demographic coding, addressable converters, records concerning subscriber satisfaction, cable system numbers, subscriber account numbers, how long a subscriber has received each cable service or programming, whether they are new or longstanding subscribers, whether they view sports, music, or movie programming, whether they have been a subscriber for a month or less or a week or less, whether they subscribe to multiple cable services, the number of pay services subscribed to, whether they subscribe to "a la carte" programming, a la carte viewing choices, whether they subscribe to premium services such as premium sports or premium music and how many, whether they have ordered a pay-per-view selection and the number of times, and whether they subscribe to particular programming channels such as the Disney Channel, the Playboy Channel, HBO, Cinemax, the SportsChannel, Bravo, Galavision, the Music Channel, Showtime or the Movie Channel.

[8] Time Warner advertised the lists through a list broker. *See* Ex. 4 (AR 795-97, 800).

through telemarketing. *See* Ex. 9 (TW 903-17). Time Warner sold the list of 21,887 subscriber names and addresses to Colorado Prime Foods for $2,216.83. *See id.* The list of subscriber information was sent to a direct marketing services company called Database America and a list managing company called Jami Marketing Services. *See id.* Time Warner sold another list in April, 1997 of the names and addresses of all its subscribers in certain areas who were active merchandise buyers and had children in the household five years of age and younger. *See* Ex. 9 (TW 3084-3144). Time Warner sold the list of 14,905 names and addresses to Gomola for $1,262.31. *See id.* This list also was disclosed to a direct marketing services company called Venture Communications International. *See id.*

During its massive disclosures of protected subscriber information, Time Warner did not provide its subscribers any meaningful opportunity to prohibit or limit the disclosures. Time Warner's Privacy Notices failed to describe the information that was collected, the sources, the purposes, or the list sales business. Even if a subscriber somehow learned about the disclosures and gave to Time Warner an opt-out notice, the information still may have been made available for sale before the opt-out was given effect.[9] This especially was true for "new connects," subscribers whose names were disclosed within a very short time of subscribing. *See* Ex. 9 (TW 532-46) (list sales order placed 11/30/95 for *the following week's* "new connects").

---

[9] At this stage of the proceedings, there is a conflict in the evidence about how often and whether privacy opt outs were given effect in the list sales business. *Compare* Ex. 11 (Olmsted Depo.), at 94 (privacy extractions made on monthly basis) *with id.* at Ex. 7 (Harter Depo.), at 55-56 (opt-outs excluded from list sales database *when database first formed*, but subsequent opt outs may not have been excluded) and *id.* at 136-38 (opt outs made when local divisions updated their subscriber records for list sales database). If opt outs were effected when the local operating divisions updated their subscriber records for the list sales database, then many opt outs were not given effect for several years. *See* Linden Aff., Ex. 9 (TW 430-32). Even if opt outs were effected on a monthly basis, many could have been sold before the next month's update to the database.

By engaging in the list sales business, Time Warner also failed to protect against unauthorized access to subscriber information as required by Section 551(c)(1).

## II.   THE DEFINITION OF THE CLASS

Plaintiffs move for certification of an injunction and declaratory relief class under Rule 23(b)(2) and a damages subclass under Rule 23(b)(3).  This action is particularly well-suited for class certification under Rule 23 given Defendants' uniform conduct directed to all Class Members.  Certification for injunctive and declaratory relief is proper under Rule 23(b)(2), in that Time Warner has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole," and continues to do so.  A damages subclass also should be certified under Rule 23(b)(3), in that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  In the event this Class and Subclass is not certified as requested, Plaintiffs move the Court to apply one of the alternatives described in II (C), below.

### A.   The Rule 23(b)(2) Injunction Class

Plaintiffs seek a Rule 23(b)(2) class (the "Injunction Class") for injunctive and declaratory relief, defined as follows:

> All persons who were Time Warner Cable subscribers from 1994 through 1998.

All of the Class Members in the Injunction Class have received defective Privacy Notices in violation of Section 551(a) and have had their personally identifiable information subject to unauthorized access and disclosure in violation of Section 551(c)(1).  The number of Class Members in the Injunction Class presently is unknown but is believed to be approximately 10.8 million. *See*

13

Linden Aff., Ex. 3 (Answer), at ¶ 38.  As part of the injunctive relief sought for the (b)(2) Class,

Time Warner would be ordered to refrain from engaging in the list sales business, revise its Privacy

Notice nation-wide to comply with the Cable Act, and notify subscribers of the violations of their

privacy rights under the Cable Act.

**B.      The Rule 23(b)(3) Damages Subclass**

In addition, Plaintiffs seek a Rule 23(b)(3) subclass (the "Damages Subclass") for

statutory damages, defined as follows:

> All Time Warner Cable subscribers who were included on certain
> lists disclosed to third parties as part of Time Warner Cable's list
> sales business from 1994 to 1998, except for those subscribers who
> gave their prior written or electronic consent to such disclosures.

Appendix A attached hereto sets forth the lists that are applicable to the Damages Subclass.  These

lists represent only some of the lists that Time Warner sold through its list sales business.  Therefore,

the Damages Subclass does not include all subscribers whose personal information was sold.  Rather,

the Damages Subclass includes those subscribers as to whom it can be verified from Time Warner's

own records that their personal information was sold.  Each of these subscribers has a statutory right

to damages.

All Class Members in the Damages Subclass, in addition to having been subject to

the common violations applicable to the entire Injunction Class, also have been subject to violations

of Section 551(c)(1) in that their personally identifiable information has been disclosed without their

prior written or electronic consent.  As set forth in Appendix A, Plaintiffs believe the potential

maximum number of Class Members in the Damages Subclass is approximately 3.6 million.  Further

discovery beyond that which was permitted at this stage of the proceedings may result in a substantially lower number of identifiable Class Members in the Damages Subclass.

Class Members in the Damages Subclass may be identified from Time Warner Cable's main subscriber databases and/or its list sales database. The lists included in Appendix A consist only of sales of "full lists" of subscribers; that is, they included all Time Warner subscribers in the list sales database who met the selection criteria ordered by the customer (as opposed to a subset or a random set). *See* Ex. 7 (Harter Depo.), at 106-07, 111, 116-21, 131-32 & Ex. 3 thereto. Therefore, subscribers on many of the lists can be identified in Time Warner Cable's subscriber databases. For example, in June, 1997, Time Warner sold to the Book of the Month Club a full list of (all available) Time Warner Cable subscribers who began their service between March and May, 1997, and subscribed to the Disney Channel. See Ex. 9 (TW 2972-83). The list of 18,645 subscribers was a full list of those subscribers. *See id.* Subscribers who were included on that list can be identified through Time Warner's subscriber databases.[10]

In addition, the subscribers on the lists can be identified in the list sales database by a "flag" appended to the subscribers' records, which can be seen by using the Focus software used to fulfill orders in the list sales database. See Ex. 6 (Harter Aff.), at ¶¶ 12, 14, 15.[11]

---

[10] Subscribers "available" and included on such a list would not include subscribers in local operating divisions that did not include their subscribers in the list sales database or those who were excluded from the database because they had requested privacy. *See* Ex. 12 (Second Supp. Resp.), Int. #9, 10; Ex. 11 (Olmsted Depo.), at 94.

[11] When a customer ordered the same type of list that it had ordered before, Time Warner was able to omit from the new list the names that had been sold on the previous list by instructing the Focus program to skip the flagged names from the first list. Ex. 6 (Harter Aff.), at ¶ 14; Ex. 7
(continued...)

Finally, since no further enhancements or updates to the list sales database presumably occurred once the decision was made to end the list sales business, all of the full lists sold after that time can be run on the list sales database as it exists today to ascertain the subscribers who were sold on those lists. See Ex. 5 (Collins Depo.), at 18, 87; Ex. 13 (Burakoff Depo.), at 140; *see also* Ex. 11 (Olmsted Depo.), 88-89 (backup tapes of list sales database maintained for 5 weeks), 91-93 (Time Warner has retained list sales database since last backup), 192-93 (subscribers on last lists can be identified).[12]

If, after full discovery and the merits determination, the amount of Time Warner's damages liability raises due process concerns, such concerns can be addressed at that time, including considering whether the liability should be reduced. However, such a reduction can be effected by the Court at the end of the case, if necessary. In any event, as the Second Circuit made clear in this case, such potentiality does not affect whether this case may proceed procedurally as a class action. *See Parker*, 331 F.3d at 21-22 ("it may be that in a sufficiently serious case the due process clause might be invoked, *not to prevent certification*, but to nullify that effect and reduce the aggregate damage award") (emphasis added); *see also id.* at 27 n.4 (Judge Newman, in concurring opinion,

---

[11](...continued)
(Harter Depo.), at 114-15; *see, e.g.*, Ex. 9 (TW 254, 255, 333, 502, 534, 549, 649-50, 720, 771, 783, 793, 803, 939, 948, 959, 970, 981, 2171).

[12] Although Plaintiffs have not been permitted certain discovery regarding enhancements at this stage of the proceedings, it appears that the list sales database may only have been enhanced once between 1994 and February, 1997, in 1995 or 1996. *See* Ex. 7 (Harter Depo.), at 10, 58. It also appears that the last update of subscriber information from any of the local cable divisions occurred in June, 1998, although for many divisions the last update was several years earlier. *See* Ex. 9 (TW 430-32). In any event, the date of the last enhancement or update can be determined from Time Warner's records (*see* Ex. 7 (Harter Depo.), at 56-58) and all full lists generated after that date can be re-created from the list sales database (or its last backup tape) as it exists today.

expressing disagreement with cases considering extent of damages in certification decision); *id.* at

27 (Congress did not intend to permit violator to wholly avoid damages "simply because its actions

affected a large number of subscribers"); *id.* at 29 (denying certification due to size of potential

damages impermissibly would allow "wrongdoer [to] benefit[] because of the scope of its

wrongdoing").

### C.   Alternatives

In the event the Injunction Class and Damages Subclass are not certified as requested,

Plaintiffs move in the alternative as follows.

#### 1.   Allowing Damages in the Rule 23(b)(2) Injunction Class

If certification of the Damages Subclass is denied under Rule 23(b)(3), Plaintiffs

alternatively seek under Rule 23(b)(2) the statutory damages for the Class Members that would have

been included in the proposed (b)(3) subclass. *See Robinson*, 267 F.3d at 162 n.7 (noting availability

of multiple alternatives for seeking damages in (b)(2) class).

This case easily meets the standard for allowing monetary claims in a (b)(2) class

action. *See id.* at 162-67 (district court erred in applying unduly stringent standard in refusing to

allow damages claim under (b)(2)).   The statutory damages that flow automatically from the

violations of Section 551 are "incidental damages" to the primary injunctive and declaratory relief

sought for all Class Members and are recoverable under (b)(2) because they are "capable of

computation by means of objective standards and not dependent in any significant way on the

intangible, subjective differences of each class member's circumstances." *See id.* at 163; *see also*

*id.* at 165 (presumption of cohesion and unity in (b)(2) actions alleging group harm, even where

incidental damages sought). As the Second Circuit stated in this case, "*Robinson* suggests, without

17

deciding, that incidental damages claims should ordinarily be certified along with injunctive and declaratory relief claims under Rule 23(b)(2) . . . ." *Parker*, 331 F.3d at 20.

However, even if the statutory damages were found to be non-incidental, they are recoverable under (b)(2) under the "ad hoc" approach adopted by the Second Circuit in *Robinson*.[13] Under that formulation, damages are available under (b)(2) if, in light of "the relative importance of the remedies sought, given all of the facts and circumstances of the case," (1) "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant" and (2) "class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Robinson*, 267 F.3d at 164 (citations and quotations omitted). The first of these elements is satisfied if: "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id*. at 164.

In this case, forcing one of the country's leading cable operators to change its way of doing business, cease engaging in a business practice, and reform one of its core communication document to its subscribers clearly predominates in terms of the importance of the remedies sought. In no way can such far-reaching injunctive relief be considered insignificant or a sham request. In addition, if subscribers knew about Time Warner's practices regarding the list sales business and the deceptive Privacy Notices, many of them reasonably would attempt to stop and prevent it. Plaintiffs

---

[13] "[A]ny due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members . . . ." *Robinson*, 267 F.3d at 166.

themselves would prosecute this action for the injunctive and declaratory relief sought regardless of whether damages are recoverable. *See, e.g.*, Ex. 14 (Deposition of Andrew Parker), at 115-17 (from outset, suit not motivated by monetary gain). Moreover, for the reasons discussed below, class treatment would be efficient and manageable.

### 2. Limiting Damages in the Rule 23(b)(3) Damages Subclass

Plaintiffs also refer the Court to the possibility of certifying a (b)(3) subclass for damages up to a specified, but still significant, total amount, as suggested by Judge Newman in his Second Circuit concurrence. *See* 331 F.3d at 27-29. His concurrence notes: "[A] district court has discretion to certify a (b)(3) class with the aggregate amount of damages limited substantially below what a literal application of the statute might seem to require." *Id.* at 23. If the Court finds such a limit to be necessary to accord with the intent of Rule 23 and the Cable Act, plaintiffs would consider the adoption of an appropriate limit, while preserving the right of absent class members to opt out and pursue their full $1,000 claims.

## III. PLAINTIFFS SATISFY THE THRESHOLD REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a)

This case is ideally suited for class certification.[14] Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

---

[14] For purposes of this motion, the pleaded facts must be taken as true. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78 (1974). "[I]n most cases a class action properly arises *prima facie* from a well-pleaded complaint, immediately shifting to the party opposing the class the burden to prove otherwise." H. Newberg and A. Conte, Newberg on Class Actions, § 7.17 at 61 (3d ed. 1992).

representative parties will fairly and adequately protect the interests of the class.

Plaintiffs' claims satisfy all four prerequisites of Rule 23(a).[15]

### A.    The Class is So Numerous That Joinder is Impractical

The number of subscribers in the (b)(2) Injunction Class, which is equal to the total number of Time Warner Cable subscribers between 1994 and 1998, is unknown at this stage of the proceedings but is believed to be approximately 10.8 million. *See* Ex. 3 (Answer), at ¶ 38.  The number of subscribers in the (b)(3) Damages Subclass is a maximum of approximately 3.6 million. *See* App. A.  These numbers demonstrate that the class is sufficiently numerous.  "Although a wide variety of considerations are important in determining whether a class is so numerous that joinder is impracticable, the most important factor is the absolute size of the proposed class….a class defined so as to include an extremely large number of class members may, by itself, establish that joining all class members would be impracticable."  Moore's Federal Practice, §23.22; *see also Finnan v. L.F. Rothschild & Co., Inc.*, 726 F. Supp. 460, 465  (S.D.N.Y. 1989) (holding joinder impracticable based *solely* on fact classes contained 120 and 127 members, respectively).  The Second Circuit has held that "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs need not specify an exact number of Class Members, but must show only that joinder is impracticable through some evidence or reasonable estimate of the number of proposed class members. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d. Cir 1993).  That joinder

---

[15] When considering Defendants' motion for denial of class certification, the Magistrate Judge assumed Plaintiffs would be able to satisfy these threshold requirements for certification. *Parker*, 2000 U.S. Dist. LEXIS 20131.

is impracticable is further supported by the fact that Class Members are practically unable to pursue individual actions because Time Warner has concealed the violations and because the costs of bringing such an action dramatically exceed the benefits. "Numerosity may be satisfied, on the basis that joinder is likely to be impracticable, if individual class members lack the ability or the motivation to institute individual actions." Moore's Federal Practice, §23.22[1][e].

### B.   There Are Common Questions of Law and Fact

Rule 23(a)(2) does not require that all questions be common or that all issues be identical, but merely that one or more significant questions of law or fact be common. *See Robinson*, 267 F.3d at 155 (Rule 23(a) mandates that there be an issue of law or fact common to the class). *See also Beecher v. Long Island Lighting Co.*, 164 F.R.D. 144, 150 (E.D.N.Y. 1996) ("The standard for meeting the Rule 23(a)(2) requirement is qualitative rather than quantitative-- that is, there need only be a single issue common to all members of the class").

Numerous courts have found a variety of common questions based on the same disclosures being distributed to the proposed class by defendants. *See* Newberg on Class Actions, § 21.003, n.22 (collecting cases). Here, Time Warner Cable utilized uniform notices that were all defective in the same way. In addition, all Class Members have had their personally identifiable information subject to unauthorized access and disclosure in violation of Section 551(c)(1). Further, all Class Members in the Damages Subclass have had their personal information unlawfully disclosed through the same list sales business. Since all Class Members were subject to a common course of wrongful conduct, commonality is easily satisfied.

The common legal and factual issues in this action include: (a) whether Time Warner has unlawfully failed to adequately notify cable subscribers about its collection, use, and disclosure

21

of personally identifiable information; (b) whether Time Warner has unlawfully disclosed, without

consent, personally identifiable information concerning its subscribers; and (c) whether Class

Members are entitled to statutory damages and injunctive and declaratory relief.

### C.   The Named Plaintiffs' Claims Are Typical of the Class

"Typicality is established if the representative's claims 'arise from the same event or

course of conduct that gives rise to claims of other class members and the claims are based upon the

same legal theory'." *Ohman v. Kahn*, 1990 WL 97756, [1990 Tr. Binder] Fed. Sec. L. Rep. (CCH)

95,359, 96,743 at 96,744 (S.D.N.Y. June 27, 1990), (citing *Dura-Bilt Carp. v. Chase Man. Corp.*,

89 F.R.D. 87, 99 (S.D.N.Y. 1981)); *Walsh v. Northrop-Grumman Corp.*, 162 F.R.D. 440, 445

(E.D.N.Y. 1995). *See also Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001)

(citing *Robinson*, 267 F.3d at 155))

The named Plaintiffs have been Time Warner Cable subscribers during the class

period and have had their Cable Act privacy rights violated by Time Warner's alleged wrongful

practices. Ex. 2 (Amended Complaint), at ¶¶ 13-15, 28-29, 39-40.  Typicality is satisfied if the

misconduct includes material omissions, as it does here.  Thus, when Time Warner failed to make

the disclosures required by the Cable Act, the failure to disclose was visited equally upon each Class

Member, including the named Plaintiffs.  In addition, the named Plaintiffs have been subject to the

same unauthorized access to their personal information as have the other members of the Injunction

Class, and have been subject to the same unlawful disclosure of their personal information as have

other members of the Damages Subclass.[16]

---

[16]  Moreover, as typicality does not require identity of claims, even atypical aspects of the
claims can be addressed through available devices in a class action, if necessary, such as using
(continued...)

22

The focus is on the defendant's behavior, not that of the named plaintiffs or other class members, and whether the class can point to a common course of improper conduct. *See, e.g., Mayo v. Sears Roebuck & Co.,* 148 F.R.D. 576, 581 (S.D. Ohio 1993) (typicality satisfied by defendants' common failure to disclose relevant terms). Here, with the relevant conduct taking the form of failures to disclose, misuse of personal information, and unlawful disclosures of personal information through the same Privacy Notices and list sales business, the named Plaintiffs and the Class can readily point to the same general, overall course of improper conduct.

### D.     The Named Plaintiffs Will Adequately Represent the Class

Adequacy of representation consists of two components.  First,  there must be an absence of conflict or antagonism between the class representatives and the class. *In re Visa Check/Mastermoney Antitrust Litigation,* 280 F.3d 124, 142 (2d. Cir. 2001) *cert. denied* by *Visa U.S.A. Inc. v. Wal-Mart Stores, Inc.*, 536 U.S. 917 (2002). *See also* Newberg on Class Actions, § 21.05 n.37 (collecting cases).  Second, the named representatives must be represented by counsel competent and experienced in the kind of litigation to be undertaken. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992). *See also Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968).

Due to Time Warner's standardized practices regarding Privacy Notices and the list sales business, there is no conflict or antagonism between the named Plaintiffs and the other members of either the Injunction Class or the Damages Subclass.  The named Plaintiffs are

---

[16](...continued)
subclasses or separating out individual issues. *See* Moore's Federal Practice § 23.24[7], citing Fed. R. Civ. P. 23(c)(4); *Baby Neal v. Casey*, 43 F. 3d 48, 57 (3d Cir. 1994).

committed to seeking appropriate injunctive and declaratory relief for all Class Members and damages for members of the Damages Subclass. They have no interest in conflict with either goal.

The named Plaintiffs and their counsel have demonstrated their intent and ability to vigorously prosecute this litigation. Both of the named Plaintiffs have provided discovery to Time Warner and have given their depositions and are well-qualified to represent the class. They understand the purpose of this lawsuit and their responsibilities as class representatives. *See* Ex. 14 (Parker Depo.), at 14-15, 88, 96-98, 115-17; Ex. 15 (DeBrauwere Depo.), at 10, 49-50.

Many courts recognize that adequacy of representation is more a function of the qualification of class counsel than of class plaintiffs themselves. *See, e.g., Michaels v. Ambassador Group, Inc.*, 110 F.R.D. 84, 90 (E.D.N.Y. 1986); *Dura-Bilt Corp.*, 89 F.R.D. 87 at 102-03; *see also Sosna v. Iowa*, 419 U.S. 393, 403 (1975). Here, Plaintiffs' counsel are experienced practitioners in consumer protection class action litigation. They have successfully prosecuted many federal and state court class actions. Plaintiffs' counsel have demonstrated their abilities in this action, successfully opposing Time Warner's motions to dismiss and to deny class certification. *See* Ex. 16 (firm resumes).

## IV.   PLAINTIFFS   SATISFY   THE   ADDITIONAL REQUIREMENTS FOR CERTIFICATION OF A RULE 23(b)(2) INJUNCTION CLASS

The Second Circuit and this Court both have recognized that a Rule 23(b)(2) class for injunctive and declaratory relief is appropriate here. *See Parker*, 331 F.3d at 19 ("the District Court granted class certification under Rule 23(b)(2), but limited certification to Parker's request for injunctive and declaratory relief"); *Parker*, 198 F.R.D. 374, 386 (Magistrate Judge "properly recommended that class certification be limited to Plaintiffs' claims for equitable relief").

24

This action is well-suited for Rule 23(b)(2) certification because Time Warner "has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief." Fed. R. Civ. P. 23(b)(2); *see also Robinson*, 267 F.3d at 165 ("where class-wide injunctive or declaratory relief is sought under (b)(2) for alleged group harm, there is a presumption of cohesion and unity between named plaintiffs and absent class members"). As detailed above, Time Warner Cable's Privacy Notices were all defective for the same reasons and impacted Class Members in the same ways. Moreover, every Class Member was subject to having his or her personal information made available for the list sales business and subject to unauthorized access. Thus, Time Warner has acted on grounds generally applicable to the Injunction Class.

## V.   PLAINTIFFS   SATISFY   THE   ADDITIONAL REQUIREMENTS FOR CERTIFICATION OF A RULE 23(b)(3) DAMAGES SUBCLASS

Certification of the Damages Subclass under Rule 23(b)(3) is warranted because common questions of law or fact predominate and a class action is superior to other available methods of adjudicating the controversy. *See, e.g., Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990); Newberg on Class Actions, § 21.10 et seq.

### A.   Common Questions Of Law And Fact Predominate

"In determining whether common questions of fact [or law] predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *In re Blech Securities Litigation*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999); *accord, e.g., In re Lilco Sec. Litig.*, 111 F.R.D. 663, 669 (E.D.N.Y. 1986). The common issues of fact and law in this case noted above predominate over any individual issues that may arise. Even if individual issues did exist, that would not necessarily preclude class certification. *See Dura-Bilt Corp. v. Chase*

25

*Manhattan Corp.*, 89 F.R.D. 87, 93-94 (S.D.N.Y. 1981) ("Rule 23(b)(3) does not require that all questions of law or fact be common . . . the rule requires predominance, not identity or unanimity of issues among class members").

Consumer class actions readily lend themselves to findings that common questions predominate over individual ones. This case especially focuses on the common issues involved in establishing Time Warner's liability for its alleged Cable Act violations; if the common questions of law and fact concerning the Privacy Notices and list sales business are resolved in Plaintiffs' favor, damages will flow automatically to all members of the Damages Subclass. The advisory committee's notes to the 1966 Amendments to Fed. R. Civ. P. 23(b)(3) explain that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action [under 23(b)(3)] and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." In *Dura-Bilt*, 89 F.R.D. at 93, the court noted:

> Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions.

Thus, the allegations supporting the disclosure violations of the Cable Act for all members of the Damages Subclass provide the requisite predominant issues.

**B.     A Class Action Is Superior To Other Available Methods for the Fair and Efficient Adjudication Of The Controversy**

Rule 23(b)(3) also is appropriate if a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." There are no other available methods of adjudicating this controversy because, by the nature of Time Warner's conduct, the

26

victims of the violations will not be aware of those violations without the mechanisms of a class

action. Moreover, even if they somehow were made aware, subscribers are unlikely to litigate these

claims against Time Warner for only $1,000. Further, although the statute provides for attorneys'

fees to prevailing plaintiffs, subscribers are unlikely to take the risk of having to pay their attorneys

if they lose their claims. Indeed, as Judge Newman noted in his Second Circuit concurrence, "there

are strong arguments favoring a (b)(3) class." *Parker*, 331 F.3d at 23. And as the Supreme Court

has noted:

> Class actions . . . may permit the plaintiff to pool claims which would
> be uneconomical to litigate individually. [In such a case,] most of the
> plaintiffs would have no realistic day in court if a class action were
> not available.

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Ohman,* at 96,745.

Rule 23(b)(3) provides that the following factors, which are addressed below, should

be considered in assessing the superiority element:

> (a) the interest of members of the class in individually controlling the
> prosecution . . . of separate actions; (b) the extent and nature of any
> litigation concerning the controversy already commenced by . . .
> members of the class; (c) the desirability . . . of concentrating the
> litigation of the claims in the particular forum; and (d) the difficulties
> likely to be encountered in the management of a class action.

### 1.   There is No Indication of Any Class Member Interest in Individually Controlling the Prosecution of Separate Actions

Individual claims, of which subscribers here are unaware, are not practically available

in this case, and thus Class Members have no interest in "individually controlling the prosecution

. . . of separate actions." *See Parker*, 331 F.3d at 21 (likely that "few suits will be filed"). The

individual claims are small and would not be economically litigated individually. *See Moore's*

27

*Federal Practice*, 23.46[2][b] ("If few class members have filed individual suits, a court is likely to conclude that the members do not possess strong interests in their own, separate litigation"); *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 566-67 (2d Cir. 1968) ("the present case appears to fall within that class of cases in which 'the interests of individuals in conducting separate lawsuits' are more 'theoretic than practical' since 'the amounts at stake for individuals (are) so small that separate suits would be impracticable") (citation omitted); *Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1020 (E.D.N.Y. 1993) ("Class actions permit litigants to pool claims which . . . if litigated individually, might prove uneconomical").

Numerous courts have held a statutory scheme providing for fixed damages does not provide sufficient incentives for class members to pursue individual actions.   *See, e.g., Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 573 (S.D. Tex. 2000) ("Under TILA.... the maximum statutory damages recoverable are $1000, providing minimal incentive for individual suits"); *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974) (rejecting defendant's argument that provision of incentives for individual litigation in TILA precludes superiority of class action). This finding also has been made in the context of the Fair Debt Collection Practices Act.   *See Brewer v. Friedman*, 152 F.R.D. 142, 144 (N.D.Ill.1993) (certifying class under Fair Debt Collection Practices Act because statutory damages of $1,000 too insignificant to pursue on individual basis).

Moreover, if a class is not certified for damages, Time Warner will go unpunished for its massive Cable Act violations and the deterrence goal of the statute would suffer.   *See Haynes*, 503 F.2d at 1164 (if class actions were restricted under TILA, deterrence under statute would suffer). As Judge Newman noted in his Second Circuit concurring opinion, this result would be "unsatisfactory." *Parker*, 331 F.3d at 26-27.

2.     **There is No Known Litigation Concerning this Controversy Already Commenced by Members of the Class**

There are no known individual actions asserting the claims alleged in this action.  In fact, given the secret nature of the misconduct, it is probable that Class Members are unaware of it.

3.     **It Is Strongly Desirable to Concentrate the Litigation in this Forum**

As discussed above, individual litigations are not practically available.  To rule against class certification would be to accept what the Second Circuit stated would be the "likely" but "unsatisfactory" result that either "needlessly clog[s] the courts with repetitious suits . . . or reward[s] [Time Warner] with liability for only a slight amount of total damages. . . ." *Parker*, 331 F.3d at 26.  Indeed, the absence of other litigation confirms the desirability of concentrating the litigation in one forum. *See Tedesco v. Mishkin*, 689 F.Supp. 1327, 1336 (S.D.N.Y. 1988) (absence of any other action against defendants "supports a finding that Rule 23(b)(3) is met").

4.     **There Are No Difficulties in Managing This Case as a Class Action**

Because of the common course of wrongful conduct, the standardized nature of Time Warner's notice and disclosure practices alleged in this case, the automatic damages provision of the Cable Act, and the resulting lack of individual issues, this case is ideally suited for class treatment and easily manageable as a class action.

The fact that the Damages Subclass may include millions of Class Members does not create manageability problems.  As one court has stated:

> Where the potential or actual class members may number in the millions, the assertion of unmanageability is typically pressed upon the court.  In considering whether the proposed class action is "superior," the court must make a realistic evaluation of the "other available methods," keeping in mind the purposes for which amended Rule 23 was designed. *For it is just such situations where*

> representative treatment may be most needed, since...denial of the
> class action might well mean a total denial of relief as a practical
> matter for the persons injured.

*In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 357 (E.D. Pa. 1976) (quoting *Manual for*

*Complex Litigation*, Part 1, § 1.43 (rev. ed. 1973)) (emphasis added).

There is a strong presumption against denying a class action on manageability

grounds. *See In re Medical X-Ray Film Antitrust Litig.,* 1997 U.S. Dist. LEXIS 21936, *37

(E.D.N.Y. Dec. 10, 1997); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y.

1996).  Further, courts should not deny certification on manageability grounds unless they first

consider whether any procedural device could be employed to resolve the problem, such as

subclassing, trying certain issues first or separately, bifurcating liability and damages, or appointing

a special master to resolve difficult evidentiary matters. *See Robinson*, 267 F.3d at 167-68.

Time Warner's standardized practices promote manageability.   The core facts

applicable to the claim of any subscriber are virtually the same as those applicable to the claims of

others.   The resolution of such claims will involve virtually the same discovery, documents,

witnesses, and factual and legal determinations.   Moreover, as discussed above, even from the

limited discovery permitted to date, many of the subscribers in the Damages Subclass can be

identified from Time Warner's records. *See Thonen v. McNeil-Akron Inc.*, 661 F. Supp. 1271, 1276

(N.D. Ohio 1987) (ability to identify class members through defendant's records supports

manageability).

A finding that a damages subclass is unmanageable also would conflict with the

deterrent purpose underlying Section 551 of the Cable Act.  Without a class action, Time Warner

would go unpunished for its Cable Act violations, providing a clear signal to it and all other cable

operators that they need not fear enforcement of the privacy protections of the Act. The clear message would be sent to the industry that cable operators can violate the statute with virtual impunity.

## VI.    CONCLUSION

For the reasons set forth herein, this Court should certify a Rule 23(b)(2) class for injunctive and declaratory relief and a Rule 23(b)(3) subclass for damages.

DATED:      New York, NY
            May  4 , 2004

                          KIRBY McINERNEY & SQUIRE, LLP

                          By _____
                              Peter S. Linden (PSL 8945)
                              Daniel Hume (DH 1358)
                              Aaron Hovan (AH 3290)
                          830 Third Avenue
                          New York, NY  10022
                          (212) 371-6600

                          CUNEO WALDMAN & GILBERT, LLP
                          Jonathan W. Cuneo
                          Michael G. Lenett
                          317 Massachusetts Ave. N.E.
                          Suite 300
                          Washington, D.C. 20002
                          (202) 789-3960

                          HAGENS & BERMAN
                          George W. Sampson
                          Keri L. Greenheck
                          1301 Fifth Avenue, Suite 2900
                          Seattle, WA  98101
                          (206) 623-7292

31

LAW OFFICE OF JAMES M.
BEAULAURIER
James M. Beaulaurier
5600 Key Tower
700 Fifth Avenue
Seattle, WA 98104
(206) 340-1010

Attorneys for Plaintiffs

32

**APPENDIX A**

## APPENDIX A – Time Warner Full List Sales[1]

| TW Bates # | Order Date | List Purchaser | Type of List | # of Names |
|---|---|---|---|---|
| 812-16 | 9/11/95 | Sports Illustrated | Premium sports subscribers in certain zip codes | 9,500 |
| 801-11 | 9/21/95 | American Family Publishers | 7/95 New Connects | 65,746 |
| 791-800 | 9/25/95 | American Family Publishers | 1995 Active subscribers | 307,626 |
| 781-790 | 9/25/95 | American Family Publishers | 8/95 New Connects | 48,113 |
| 769-80 | 9/25/95 | American Family Publishers | 10/95 New Connects | 38,746 |
| 532-46 | 11/30/95 | Direct American Marketers | One week New Connects (Week 49) w/certain states omitted | 29,729 |
| 500-14 | 12/1/95 | Max Media | Last 30 days New Connects in certain Prizm Codes | 4,139 |
| 484-99 | 12/6/95 | MBI, Inc. | Disney Channel subs. in certain states | 10,317 |
| 2155-68 | 1/4/96 | Direct American Marketers | 1/96 New Connects w/certain states omitted | 25,300 |
| 2113-34 | 2/5/96 | CrediCorp | 12/95 New Connects w/Premium Music and income 0-$35K w/certain states omitted | 12,047 |
| 1883-1906 | 4/1/96 | Transamerica Financial | Homeowners in certain states | 12,700 (St. L.) |
| 1817-29 | 4/30/96 | United National Bank | 4/96 Hotline w/certain states omitted | 28,004 |
| 1077-1100 | 6/13/96 | Book of the Month Club | 2/96-4/96 New Connects w/Disney Channel | 17,232 |
| 1062-76 | 7/11/96 | United National Bank | 6/96 New Connects | 55,318 |

---

[1]    All documents referenced by TW Bates number in this Appendix A are included in Exhibit 17 to the Affidavit of Peter S. Linden submitted with plaintiffs' motion for class certification.

1

|  |  |  | w/certain states omitted |  |
|---|---|---|---|---|
| 1047-61 | 7/29/96 | Direct American Marketers | 6/96 New Connects w/certain states omitted | 10,144 |
| 1008-19 | 7/30/96 | United National Bank | 7/96 New Connects w/certain states omitted | 49,695 |
| 991-1007 | 7/30/96 | United National Bank | 8/96 New Connects w/certain states omitted | 57,669 |
| 979-90 | 7/30/96 | United National Bank | 9/96 New Connects w/certain states omitted | 8,489 |
| 968-78 | 7/30/96 | United National Bank | 10/96 New Connects w/certain states omitted | 54,226 |
| 956-67 | 7/30/96 | United National Bank | 11/96 New Connects w/certain states omitted | 5,329 |
| 946-55 | 7/30/96 | United National Bank | 12/96 New Connects w/certain states omitted | 8,426 |
| 937-45 | 7/30/96 | United National Bank | 1/97 New Connects w/certain states omitted | 20,539 |
| 903-17 | 8/7/96 | Colorado Prime Foods | TWC Kids, w/Disney Channel, income $35K+, homeowners, and telemarketing in certain zip codes | 21,887 |
| 2607-17 | 9/11/96 | Direct American Marketers | 8/96 New Connects w/certain states omitted | 11,487 |
| 2501-11 | 10/10/96 | Direct American Marketers | 9/96 New Connects w/certain states omitted | 4,340 |
| 2339-50 | 11/6/96 | National Geographic Society | Active male merchandise buyers w/income $75K+ | 23,974 |
| 2264-74 | 11/25/96 | Fingerhut Corp. | 10-11/96 New Connects | 63,272 |
| 2230-47 | 12/3/96 | International Masters Publishers | 8-10/96 New Connects w/Disney Channel | 23,476 |
| 1693-94 | 1/16/97 | Zoo Consortium | TWC Kids, Active Disney Channel Subs., w/children | 12,000 |

2

|  |  |  | under age 12, w/SCF selects |  |
|---|---|---|---|---|
| 3230-39 | 2/18/97 | United National Bank | 2/97 New Connects<br>w/certain states omitted | 10,799 |
| 1627, 3219-29 | 2/18/97 | United National Bank | 3/97 New Connects | 48,377 |
| 3191-3201 | 3/3/97 | Fingerhut Corp. | 1/97 New Connects | 58,239 |
| 3165-71 | 3/20/97 | KIII/New York Magazine | 12/96-2/97 New Connects<br>w/SCF selects | 20,261 |
| 3154-64 | 3/20/97 | Fingerhut Corp. | 2/97 New Connects | 47,493 |
| 3145-53 | 3/21/97 | American Museum of<br>Natural History | 10-12/96 New Connects<br>w/SCF selects | 44,841 |
| 3084-44 | 4/2/97 | Gomola | TWC Kids, active<br>merchandise buyers,<br>children age 0-5 w/SCF selects | 14,905 |
| 3050-60 | 4/8/97 | United National Bank | 4/97 New Connects<br>w/certain states omitted | 49,130 |
| 3038-49 | 4/8/97 | United National Bank | 5/97 New Connects<br>w/certain states omitted | 52,404 |
| 3061-67 | 4/8/97 | United National Bank | 6/97 New Connects<br>w/certain states omitted | 44,764 |
| 1630, 3027-37 | 4/14/97 | Book of the Month Club | 12/96-2/97 New Connects<br>w/Disney Channel | 12,938 |
| 1631, 3016-25 | 4/18/97 | Fingerhut Corp. | 3/97 New Connects | 44,705 |
| 1628, 3000-15 | 4/30/97 | Blue Cross/Blue Shield | Active Subscribers,<br>Mail Order Buyers,<br>Age 65+ w/SCF selects | 6,102 |
| 2972-83 | 6/19/97 | Book of the Month Club | 3-5/97 New Connects<br>w/Disney Channel | 18,645 |
| 2937-45 | 7/21/97 | United National Bank | 7/97 New Connects<br>w/certain states omitted | 38,535 |
| 2930-36 | 7/21/97 | United National Bank | 8/97 New Connects<br>w/certain states omitted | 47,840 |

| | | | | |
|---|---|---|---|---|
| 2921-29 | 7/21/97 | United National Bank | 9/97 New Connects w/certain states omitted | 50,461 |
| 2911-20 | 7/21/97 | United National Bank | 10/97 New Connects w/CA omitted | 32,722 |
| 3356-64 | 7/21/97 | United National Bank | 11/97 New Connects w/CA omitted | 50,948 |
| 3343-55 | 7/21/97 | United National Bank | 12/97 New Connects w/CA omitted | 53,252 |
| 3321-27 | 8/6/97 | Time Out New York | Mail order buyers, active subscribers, magazine readers, age 20-34, w/SCF selects | 5,024 |
| 2887-2910 | 8/21/97 | DDB Needham Worldwide | Active mail order buyers w/income $45-75K in certain states | 20,169 |
| 2823-31 | 9/25/97 | American Museum of Natural History | 1-3/97 New Connects w/SCF selects | 36,101 |
| 2816-22 | 9/25/97 | American Museum of Natural History | 4-6/97 New Connects w/SCF selects | 44,087 |
| 2807-15 | 9/25/97 | KIII/New York Magazine | 3-8/97 New Connects w/SCF selects | 80,719 |
| 2795-2806 | 9/30/97 | Fingerhut Corp. | 9/97 New Connects | 62,146 |
| 2774-85 | 10/6/97 | Paralyzed Veterans of America | 8-9/97 New Connects in certain states | 74,474 |
| 2765-73 | 10/9/97 | International Masters Publishers | 7-9/97 New Connects w/Disney Channel | 19,430 |
| 2664-73 | 11/17/97 | Fingerhut Corp. | 10/97 New Connects | 58,971 |
| 2638-44 | 11/18/97 | Columbia House | 9-10/97 New Connects | 163,526 |
| 3520-25 | 1/8/98 | United National Bank | 1/98 New Connects w/CA omitted | 45,610 |
| 3512-19 | 1/8/98 | United National Bank | 2/98 New Connects w/CA omitted | 43,477 |

4

| 3502-11 | 1/8/98 | United National Bank | 3/98 New Connects w/CA omitted | 44,506 |
| 3493-3501 | 1/8/98 | United National Bank | 4/98 New Connects w/CA omitted | 38,158 |
| 1635-36, 1677-78 | 1/8/98 | United National Bank | 5/98 New Connects w/CA omitted | 42,786 |
| 1654-58 | 1/8/98 | United National Bank | 6/98 New Connects w/CA omitted | 54,810 |
| 1664-66 | 1/8/98 | United National Bank | 9/98 New Connects w/CA omitted | 25,000 |
| 1671-72 | 1/8/98 | United National Bank | 10/98 New Connects w/CA omitted | 25,000 |
| 1647-49 | 1/8/98 | United National Bank | 12/98 New Connects w/CA omitted | 25,000 |
| 1673-74 | 1/8/98 | United National Bank | 8/98 New Connects w/CA omitted | 25,000 |
| 3529-46 | 1/13/98 | Fingerhut Corp. | 11/97 New Connects | 81,456 |
| 3484-92 | 1/28/98 | Fingerhut Corp. | 12/97 New Connects | 59,172 |
| 3471-77 | 2/3/98 | American Museum of Natural History | 7-9/97 New Connects w/SCF selects | 47,703 |
| 3467-70 | 2/3/98 | American Museum of Natural History | 10-12/97 New Connects w/SCF selects | 41,283 |
| 3457-66 | 2/19/98 | Fingerhut Corp. | 1/98 New Connects | 87,488 |
| 3425-32 | 3/11/98 | Fingerhut Corp. | 2/98 New Connects | 51,078 |
| 3413-18 | 3/30/98 | KIII/New York Magazine | 9/97-2/98 New Connects w/SCF selects | 85,391 |
| 1670 | 4/21/98 | Fingerhut Corp. | 1/98 New Connects | 30,000 |
| 3381-87 | 5/15/98 | Columbia House | 3-4/98 New Connects | 120,376 |
| 3365-75 | 5/20/98 | Fingerhut Corp. | 4/98 New Connects | 83,383 |

5

| 1669 | 5/20/98 | Fingerhut Corp | 3/98 New Connects | 25,000 |
| 1668 | 5/20/98 | Fingerhut Corp. | 2/98 New Connects | 16,000 |
| 1676 | 6/4/98 | Fingerhut Corp. | 4/98 New Connects | 22,000 |
| 424 | 6/25/98 | Fingerhut Corp. | 5/98 New Connects | 50,000 |
| 422-23 | 7/9/98 | Columbia House | 4/98-6/98 2x+ renewal Ages 40-55 | 75,000 |
| 1675 | 8/31/98 | Fingerhut Corp. | 4/98 New Connects | 28,000 |

Total = 3,624,155