UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

ANDREW PARKER and ERIC DeBRAUWERE, on
behalf of themselves and all others similarly situated,

                                            Plaintiffs,                    MEMORANDUM AND ORDER

                        -against-                                          98-CV-04265 (ILG) (JMA)

TIME WARNER ENTERTAINMENT CO., L.P.,
and TIME WARNER CABLE, INC.,

                                            Defendants.

----------------------------------------------------------------x

GLASSER, United States Senior District Judge:

     Proposed class representatives Andrew Parker and Eric DeBrauwere (the "Representative

Plaintiffs") filed an amended class action complaint on October 30, 1998 (the "Complaint")

against defendants Time Warner Entertainment Company, L.P. and its subsidiary, Time Warner

Cable (collectively, "Time Warner" or the "defendant").  The Complaint alleges, *inter alia*, that

the defendant violated certain provisions of the Cable Communications Policy Act of 1984, 47

U.S.C. § 551 *et seq.* (the "Cable Act").[1]

     The Representative Plaintiffs and the defendant move jointly for approval of a class

action settlement agreement.  The attorneys for the Representative Plaintiffs, Hagens Berman

Sobol Shapiro LLP (the "Hagens Firm"), Kirby McInerney LLP (the "Kirby Firm"), Cuneo

Gilbert & LaDuca LLP (the "Cuneo Firm") and the Law Offices of James M. Beaulaurier (the

---

[1]     The Complaint further alleged that the defendants committed deceptive trade practices in violation
of New York Gen. Bus. L. § 349 and similar state deceptive trade practices statutes, and are liable for negligent
misrepresentation and unjust enrichment.  The Court declined to exercise pendant jurisdiction over these state law
claims in Parker v. Time Warner Entertainment Co., L.P., 198 F.R.D. 374, 386 (E.D.N.Y. 2001) (Glasser, J.).

"Beaulaurier Firm" and collectively, "Class Counsel") move for attorneys' fees and expenses. The attorneys for objector-intervenors Rick and Sharon Lobur, Forizs & Dogali, P.L. and The Anderson Law Firm (together, the "Loburs' Counsel"), and the attorneys for objector-intervenors Lydia Townsend and Rosalie Vitrano (together with the Loburs, the "Objectors"), the Law Offices of Steven B. Witman (the "Witman Firm") each move for attorneys' fees and expenses.

For the reasons stated below, the parties' motion for approval of the settlement agreement is granted.  Class Counsel's motion for attorneys' fees, expenses and plaintiff incentive awards is granted in part and denied in part.  The Loburs' Counsel's motion for attorneys' fees and expenses is granted in part and denied in part.  The Witman Firm's motion for attorneys' fees and expenses is denied.  The Objectors' respective motions for incentive awards are denied.

## I.  Background

This order brings to a close a case that has raised compelling questions of law arising at the intersection of consumer protection statutes that provide for minimum statutory damages and the class action mechanism.  Each of these tools is intended to encourage the prosecution of cases that would otherwise be too costly for an individual plaintiff to pursue.  The combination of the two threatens defendants with the multiplication of statutory damages, possibly beyond the contemplation of Congress and the limits of due process.

The settlement of this case reserves for another day the question of whether a class seeking statutory damages for each of its members, far in excess of the actual harm and ruinous to the defendant, should be certified for trial.  However, the proposed settlement itself raises interesting questions about the valuation of settlements involving large numbers of class members and benefits that are difficult to value.

The settlement, while fair, adequate and reasonable – in that it makes a minimal sum available to the purported victims of a minimal harm – is nonetheless unsatisfying because so much time and labor was expended to achieve so little.

## A.  Prior Decisions

This case has already been the subject of several orders.  See No. 98 Civ. 4265 (ERK), 1999 WL 1132463 (E.D.N.Y. Nov. 8, 1999) (Korman, J.) (the "1999 Order") (denying defendant's motion to dismiss the Complaint); 198 F.R.D. 374 (E.D.N.Y. 2001) (the "2001 Order") (adopting the report and recommendation of Magistrate Azrack certifying a class for injunctive and declaratory relief but denying certification of a class for damages); 331 F.3d 13 (2d Cir. 2003) (the "2003 2d Cir. Decision") (vacating the decision of this Court on the question of class certification and remanding for further proceedings); 239 F.R.D. 318 (E.D.N.Y. 2007) (the "2007 Order") (denying settlement class certification under Fed. R. Civ. P. 23(b)(2) because monetary damages predominated over injunctive relief and under 23(b)(3) because of inadequate notice and procedural and substantive unfairness).  This Memorandum and Order incorporates and assumes familiarity with these decisions.

## B.  Facts

The Complaint alleges that Time Warner collected detailed personal information about cable television subscribers throughout its nationwide system.  (Compl. ¶¶ 4, 43).  Time Warner maintained this information in its list sales database ("LSDB"), which it offered for sale to third parties, including telemarketers, direct marketing services companies, and Time Warner affiliates and divisions.  (Compl. ¶¶ 6, 9, 45-48, 60).  The Complaint alleged that the database included subscribers' names and addresses, premium subscriptions, such as HBO, Disney, and Playboy,

credit card information, places of employment, whether subscribers lease or own their residence, and social security and drivers' license numbers.  (Compl. ¶¶ 11, 43).  Time Warner enhanced the information that it collected directly from its subscribers with information it had obtained from third parties, including Time Warner affiliates and divisions.  (Compl. ¶¶ 4, 7, 44, 68).

The Complaint alleges that Time Warner violated the Cable Act's substantive privacy provisions by collecting and disclosing its customers' personally identifiable information ("PII") and failing to give proper notice of its practices.[2]  Under the Cable Act, cable providers must give notice to their customers of the nature of the PII that they collect, how it is used, the nature, frequency and purpose of any PII disclosures and their retention of such information, all as provided for by 47 U.S.C. § 551(a)(1).[3]  The Complaint alleges that Time Warner violated the notice provisions of § 551(a) by failing to adequately notify subscribers of its use and disclosure

---

[2]     While the term is not affirmatively defined by the Act, section 551(a)(2) provides that "[f]or purposes of this section, the term 'personally identifiable information' does not include any record of aggregate data which does not identify particular persons." 47 U.S.C. § 551(a)(2).  In addition, the legislative history states that personally identifiable information "would include specific information about the subscriber, or a list of names and addresses on which the subscriber is included . . . ." H.R.Rep. No. 934, 98th Cong., 2d Sess. 79, U.S.Code Cong. & Admin. News 1984, pp. 4655, 4716.

Scofield v. Telecable of Overland Park, Inc., 973 F.2d 874, 876 (10th Cir. 1992).

[3]     (a)(1) At the time of entering into an agreement to provide any cable service or other service to a subscriber and at least once a year thereafter, a cable operator shall provide notice in the form of a separate, written statement to such subscriber which clearly and conspicuously informs the subscriber of –

(A) the nature of personally identifiable information collected or to be collected with respect to the subscriber and the nature of the use of such information;

(B) the nature, frequency, and purpose of any disclosure which may be made of such information, including an identification of the types of persons to whom the disclosure may be made;

(C) the period during which such information will be maintained by the cable operator;

(D) the times and place at which the subscriber may have access to such information in accordance with subsection (d) of this section;

47 U.S.C. § 551(a)(1).

of their PII, including the nature of the PII collected from subscribers and third party sources, the

nature and frequency of the uses and disclosures of such information, and the period during

which Time Warner maintained such information.  (Compl. ¶¶ 62-71, 80).

Subsection § 551(c) of the Cable Act prohibits the disclosure of PII without the prior

consent of a subscriber with the exceptions provided for in subdivision (c)(2).  This subdivision

allows for the disclosure of the names and addresses of subscribers to any cable service or other

service, provided that customers are given the opportunity to opt out of such disclosure and so

long as the disclosure does not give additional detail pertaining to customer viewing habits.[4]  The

Complaint alleges that Time Warner violated the disclosure provisions of § 551(c) by disclosing

information other than subscribers' names and addresses without their consent.  (Compl. ¶¶ 8,

55-60, 72-74).

---

[4]        (c)(2) A cable operator may disclose such information if the disclosure is--

(A) necessary to render, or conduct a legitimate business activity related to, a cable service or other service provided by the cable operator to the subscriber;

(B) subject to subsection (h) of this section, made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed;

(C) a disclosure of the names and addresses of subscribers to any cable service or other service, if-

(i) the cable operator has provided the subscriber the opportunity to prohibit or limit such disclosure, and

(ii) the disclosure does not reveal, directly or indirectly, the--

(I) extent of any viewing or other use by the subscriber of a cable service or other service provided by the cable operator, or

(II) the nature of any transaction made by the subscriber over the cable system of the cable operator  . . .

47 U.S.C. § 551(c)(2)(A-C).

The Complaint sought minimum statutory damages of at least $1,000 per violation for every subscriber, as provided for by § 551(f)[5], claiming injury by the class "which is, at a minimum, hundreds of millions of dollars." (Compl. ¶¶ 77, 82.)

## C. Procedural History

### 1. The Settlement Agreement

The parties first reached a proposed settlement in June 2005 (the "Prior Agreement"). The Prior Agreement gave class members whose names appeared in the LSDB the opportunity to claim free Time Warner cable services for their own use, or to transfer that benefit to a third party. After a hearing on May 19, 2006, at which the parties and the Objectors were heard, the Prior Agreement was ultimately rejected by the Court for reasons set forth in the 2007 Order. Chief among the reasons for its rejection was distributional unfairness to class members who were identified as being in the LSDB, but did not at the time of the settlement live in areas of the country where cable television service is provided by Time Warner. 2007 Order, 239 F.R.D. at 340. Those class members could not personally use the free cable services and could only transfer the benefit to those who did live in such areas. The Prior Agreement was also rejected because the notice provisions failed to provide "the best notice that is practicable under the circumstances," Fed. R. Civ. P. 23(c)(2)(B), to persons then identified as being in the LSDB who were no longer Time Warner Cable subscribers. 2007 Order, 239 F.R.D. at 333-36.

---

[5]      (1) Any person aggrieved by any act of a cable operator in violation of this section may bring a civil action in a United States district court.  (2) The court may award – (A) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (B) punitive damages; and (C) reasonable attorneys' fees and other litigation costs reasonably incurred.

47 U.S.C. § 551(f).

6

The Representative Plaintiffs and the defendant filed a new settlement agreement on April 2, 2008 (the "Settlement Agreement").  This Court granted preliminary approval of the Settlement Agreement, provisionally certified the class and directed dissemination of notice to the class in an order dated May 8, 2008 (the "Preliminary Approval Order").  The provisionally certified class (the "Class") consisted of: "All persons throughout the United States who were Time Warner Cable subscribers at any point in time between January 1, 1994, and December 31, 1998, [herein, the "Relevant Period"] except for current Time Warner Cable officers, directors, employees and counsel." (the "Class Members").  (Prelim. Approval Order 2.)

In the 2007 Order, the Court identified four categories of class members to which the Prior Agreement provided disparate benefits:

> (1) those Class Members who are listed on the Time Warner List Sales Database dated January 1, 1999, ("LSDB"), and who currently subscribe to Time Warner Cable services . . . (hereinafter "Category I" Class Members); (2) those Class Members who are listed on the LSDB and who no longer subscribe to Time Warner Cable services, but live in an area served by Time Warner Cable (hereinafter "Category II" Class Members); (3) those Class Members who are listed on the LSDB and who no longer subscribe to Time Warner Cable services, and who do not live in an area served by Time Warner Cable (hereinafter "Category III" Class Members); and, (4) those Class Members who are not listed on the LSDB (hereinafter "Category IV" Class Members).

2007 Order, 239 F.R.D. at 326.

The categories recognized by the Court in the 2007 Order remain applicable to the current Settlement Agreement.[6]  The benefits available to each category of Class Member are provided for as follows:

---

[6]     The use of the 1999 LSDB, the version of the LSDB existing as of January 1, 1999, (defined in § II.A.1.a *infra*) to the exclusion of other potentially recoverable iterations of the LSDB "add[ed] an element of

| Class Category | Benefits Available |
|---|---|
| Category I | (i)  One free month of any Time Warner Cable service that is available on a monthly basis and to which the customer does not currently subscribe, or<br><br>(ii)  two free Movies on Demand, or<br><br>(iii)  a $5 check. |
| Category II | (i)  One free month of any Time Warner Cable service that is available on a monthly basis, with no installation fee of any kind, or<br><br>(ii)  two free Movies on Demand, or<br><br>(iii)  the ability to transfer to any other person who lives within an area serviced by Time Warner Cable one free month of service or two free Movies on Demand, or<br><br>(iv) a $5 check. |
| Category III | (i)  The ability to transfer to any other person who lives within an area serviced by Time Warner Cable one free month of service or two free Movies on Demand, or<br><br>(ii) a $5 check. |
| Category IV | No benefit. |

(Settlement Agreement ¶ 4(a)-(b).)

The benefits made available by the Settlement Agreement differ from those in the Prior Agreement in that all three categories of Class Members eligible to receive benefits may now opt to receive a $5 check rather than service benefits.[7]  All class members who select as their benefit

---

unfairness to the Proposed Settlement."  2007 Order, 239 F.R.D. at 340.  In response to this finding, Time Warner was required under the Settlement Agreement to review all recoverable backup tapes of former iterations of the LSDB to discover the identities of additional Class Members whose names appeared therein.  As a result, Categories I, II and III under the current Settlement Agreement will include all Class Members whose names appeared on any recoverable iteration of the LSDB dating from the Relevant Period.  Likewise, Category IV Class Members are those whose names do not appear on any recoverable version of the LSDB.

[7]    The Settlement Agreement provides that any Class Members that submitted a claim for benefits under the Prior Agreement ("Former Claimants") may receive the one month of a free cable service or two free Movies on Demand they had previously requested without submitting another claim form, or may request a benefit that was not previously available to them under the Prior Agreement by submitting a new claim form.  (Settlement Agreement ¶ 4(c)-(d).)

a free month of service may either contact Time Warner to cancel the service at the end of the month or do nothing and be billed for the service at Time Warner's usual rate until such a time as they cancel it.  (Settlement Agreement ¶ 4(e).)

In addition to the direct benefits to the Category I, II and III Class Members, the Settlement Agreement also provides for what is termed "Remedial Relief".  (Settlement Agreement ¶ 12.)  This includes revisions to Time Warner's privacy notice and additional revisions to the privacy notice should Time Warner reenter the business of selling customer information that has been enhanced with publicly available data.  (Settlement Agreement  ¶ 12.)  Furthermore, Time Warner will provide Class Counsel with its privacy notices for a period of three years from the date the Settlement Agreement is approved.  (Settlement Agreement ¶ 12.)  Finally, Time Warner will employ a Chief Privacy Officer for an unspecified period of time and will give as cy pres relief $250,000 to each of the Samuelson Law, Technology & Public Policy Clinic at Boalt Hall Law School and the Center for Democracy and Technology's Ronald Plesser Fellowship.  (Settlement Agreement ¶ 14.)

Once the settlement becomes effective, Class Members release "all claims which have been alleged in the Action, and claims which could have been alleged in the Action relating to Time Warner's privacy notices and list sales practices between 1994 and 1998 under 47 U.S.C. § 551 and/or any similar federal or state consumer protection law, privacy law and/or common law." (Settlement Agreement, Definitions, ¶ O.)  The Settlement Agreement also provides that, subject to Court approval, Time Warner will pay Class Counsel's fees and costs in the total amount of $5 million.  Class Counsel will pay any objector's counsel's fees or costs, as awarded by the Court or otherwise.  (Settlement Agreement ¶ 26.)

**2.  Notification and Submitted Claims**

Notice by mail, directed to more than 7.2 million current and former subscribers whose names appeared in the LSDB, was sent June 6-9, 2008.  (Affidavit of Jeanne C. Finegan dated Nov. 26, 2008 ("Finegan Aff."), ¶¶ 9-10.)  Of these, 286,505 were postcards mailed to Former Claimants; 1,518,526 were long form notices ("Notice") mailed to current subscribers and former subscribers whose addresses had been verified and had not previously claimed a benefit; and 5,453,436, approximately 75% of the total, were postcards mailed to the last known address of former subscribers whose address information could not be updated with Time Warner's current subscriber database or the National Change of Address registry ("NCOA").  (Finegan Aff. ¶¶ 6-9.)  In addition, the claims administrator established a settlement website (www.twcsettlement.com) where English and Spanish versions of the Notice and claim form were available.  (Finegan Aff. ¶ 18.)  A summary form of the Notice was published in several national publications.  (Finegan Aff. ¶ 14.)  As of November 23, 2008, the claims administrator had received 172,602 claim forms in response to the Settlement Agreement to add to the 286,503 claim forms received in connection with the Prior Agreement, for a total of 459,105.  (Finegan Aff.  ¶ 20.)

**3.  Fairness Hearing**

On December 9, 2008, the Court held a settlement hearing pursuant to Fed. R. Civ. P. 23(e)(2) (the "Fairness Hearing").  Arguments were heard on the motion for approval of the Settlement Agreement, motions for approval of attorneys' fees and expenses for Class Counsel and Objectors' counsel, and motions for incentive awards for the Representative Plaintiffs and

Objectors.  In addition, objections from class members Bob Lamb and Franklin Conde were also

heard.  See § II.C(2) *infra*.

## II.  Discussion

### A.  Certification of the Settlement Class

The parties "[f]or settlement purposes only . . . stipulate[d] that the Class will be certified

under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3)."  (Settlement Agreement ¶ 2.)  Notwithstanding

the parties' willingness to stipulate to the certification of the class for settlement purposes, the

Court bears an independent responsibility to make a determination that every Rule 23

requirement is met before certifying a class.  Karvaly v. eBay, Inc., 245 F.R.D. 71, 78 (E.D.N.Y.

2007) (Glasser, J.).

"Because the terms and structure of the Settlement Agreement differ only in relatively

small details from the version rejected by the Court in the 2007 Order, much of the Court's

analysis of the previous settlement proposal applies with equal force to this one."  (Prelim.

Approval Order 1-2.)  Therefore, the Court relies upon its prior analysis which led to the

conclusion that the Fed. R. Civ. P. 23(a) factors of numerosity, commonality, typicality and

adequacy were satisfied by the Class.  2007 Order, 239 F.R.D. at 328-30.

### 1.  Rule 23(b)(3) Factors

When each of the Rule 23(a) factors are met, "parties seeking class certification must

show that the action is maintainable under Rule 23(b)(1), (2), or (3)."  Amchem Products, Inc. v.

Windsor, 521 U.S. 591, 614 (1997).  As set forth in detail in the 2007 Order, the Class is not

maintainable under Rule 23(b)(2) because the damages component of the settlement

predominates over the equitable relief component.  2007 Order, 239 F.R.D. at 332.  (See Prelim. Approval Order 2.)  Therefore, only the Rule 23(b)(3) factors will be reviewed.

Rule 23(b)(3) applies to the certification of class actions for damages.  The rule requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### a.  Notice Required for (b)(3) Classes Pursuant to Rule 23(c)(2)(B)

In the 2007 Order, the Court did not reach the question of whether the Rule 23(b)(3) factors of "predominance" and "superiority" were satisfied because the notice requirements for 23(b)(3) classes, found in Rule 23(c)(2)(B), had not been satisfied.  Rule 23(c)(2)(B) calls for "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Pursuant to the Prior Agreement, the Class Members entitled to receive direct settlement benefits were identified from a list of the 4.7 million customers comprising the LSDB as of January 1999 (the "1999 LSDB").  2007 Order, 239 F.R.D. at 320, 325.  Of those customers in the 1999 LSDB, the parties undertook to individually notify only those 1.37 million persons who were Time Warner Cable subscribers at the time of the Prior Agreement – the Category I Class Members.  (Joint Memorandum in Support of Final Approval of Settlement dated May 12, 2006 ("2006 Joint Mem."), 24.)  Accordingly, individual notice was not provided to the approximately 3.4 million other persons whose names appeared in the 1999 LSDB who were no longer Time Warner Cable subscribers – the Category II and Category III Class Members.  Individual notice

12

was also not provided to the approximately 10.8 million Class Members whose names did not appear in the 1999 LSDB – the Category IV Members.  2007 Order, 239 F.R.D. at 325.

Testimony was offered by objectors Rick and Sharon Lobur that the addresses from a database of 16 million persons created in January 1999 could be updated to provide current addresses for those persons with 90% accuracy at a cost of $22,400 using existing software.[8] 2007 Order, 239 F.R.D. at 335.  The Court held that if the addresses of a large number of additional Class Members could be determined at such a minimal cost, that limiting notice only to those 1.37 million Category I Class Members could not constitute the "best notice practicable" required by Rule 23(c)(2)(B).  Id. at 336.

Pursuant to the Settlement Agreement, Time Warner first reviewed all available LSDB backup tapes to identify as many Category I, II and III Class Members as possible.  See n.6 supra.  This process yielded the names of approximately 7.2 million former subscribers, including those 4.7 million subscribers identified from the 1999 LSDB.   Time Warner then took those subscriber names and attempted to update their addresses using their own current subscriber lists and the NCOA database.  As a result, notice was mailed to 286,505 Former Claimants and approximately 1.52 million verified and 5.45 million unverified addresses of persons in Categories I, II and III, in addition to notice provided through the publication program.  See § I.B.2 supra.  Although efforts to improve the accuracy of the Class Members' mailing addresses fell far short of the 90% accuracy figure urged by the Loburs, the procedures

---

[8]     It is unclear whether the Loburs' expert was referring to the 1999 LSDB which contained only 4 to 5 million subscribers, or some larger list of all Time Warner subscribers circa 1999 which may also have been available.  Nonetheless, the broader point that much more could be done to identify Class Members was accepted by the Court.

nonetheless appear to have facilitated the "best notice practicable" and have satisfied the Court's concerns about compliance with Rule 23(c)(2)(B).

**b.      Predominance of Common Issues of Law and Fact**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.  "That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy." Id. at  623 n.18.

Here, the questions common to Class Members that predominate are whether Time Warner's privacy notice satisfied its statutory notice obligations pursuant to 47 U.S.C. § 551(a) and whether Time Warner satisfied its statutory obligation pursuant to §551(c) not to disclose a subscriber's PII without first obtaining their consent.  The privacy notice issue applies to all Class Members insofar as all subscribers are entitled to be informed of "the nature, frequency, and purpose of any disclosure which may be made of [any PII collected or to be collected], including an identification of the types of persons to whom the disclosure may be made."  47 U.S.C. § 551(a)(1)(B).  The nondisclosure issue applies to any Class Member whose PII was sold without their consent, a group which includes some or all of the subscribers appearing in the LSDB during the class period.  Therefore, the Court finds that common questions of law or fact predominate.

c.      **Superiority of Class Action**

In evaluating whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," the Court may consider any relevant factor, including, but not limited to, the factors listed in Rule 23(b)(3).

i.      **Statutory Factors**

The Court will first address those factors listed in Rule 23(b)(3):

(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating litigation in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3).

In the 2001 Order, this Court noted that "the interest in pursuing individual relief is typically lower in actions, such as this one, to enforce compliance with consumer protection laws, since damage awards in such cases are generally too small to permit a single consumer to bring suit."  198 F.R.D. at 385.  However, the Court also observed that the availability of statutory damages and attorneys' fees provided for in the Cable Act's enforcement provisions makes individual enforcement feasible, if not probable.[9]

_____

[9]         In the 2001 Order, the Court remarked that "the argument that class actions should be available because subscribers may be discouraged from bringing individual actions is less persuasive where, as here, the statute under which recovery is sought specifically provides for 'reasonable attorney's fees and other litigation costs reasonably incurred.'" 198 F.R.D. at 385.  See 47 U.S.C. § 551(f) (providing for private enforcement of Cable Act violations and permitting the Court to award statutory damages, punitive damages and reasonable attorneys' fees and other litigation costs).

As a practical matter, neither the parties nor the Court know of any such individual actions either currently being prosecuted or reduced to judgments in the past.  The reasons for this may include the cost of bringing a suit, the negligible harm or general compliance by cable operators.  Therefore, while the prospect of statutory damages could theoretically tempt some individual plaintiffs, the difficulty in litigating and proving a Cable Act violation is such that the interest of individual plaintiffs in controlling an action is insignificant, particularly considering that individual Class Members may opt out of the Settlement Agreement to pursue their own claims.

The parties have represented that no other litigation addressing the claims raised in the Complaint has been filed.  (Memorandum of Law in Support of Preliminary Approval of Revised Settlement dated April 2, 2008 ("Joint Prelim. Mem."), 18.)  Although the absence of other cases may show a lack of interest in the action by other class members, it may also show that the incentives to pursue an individual action are insufficient.  The many letters reviewed by the Court from Class Members who are offended by Time Warner's alleged practices sufficiently demonstrate that other Class Members are interested in the action.  See § II.C(2) *infra*.

There is no apparent reason why concentrating the plaintiffs' claims in this forum would be undesirable.  As New York City constitutes a major market for Time Warner Cable, there are likely hundreds of thousands, if not millions, of Class Members residing in the Eastern District. In any case, this action has been prosecuted here for more than a decade and the time for any suggestion of changing venue has long passed.  As to the difficulties in managing a class action, the Supreme Court has held that in evaluating a settlement "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." Amchem, 521 U.S. at 620.  Considering only the matters pertinent to the

superiority determination listed in Rule 23(b)(3), a Class Action appears to be the superior method for the adjudication of this action because the incentives to bring individual actions are insufficient.

### ii.    Disproportionate Liability

In its 2001 Order, this Court denied class certification under Rule 23(b)(3), holding that "a class action is not the superior manner of proceeding where the liability defendant stands to incur is grossly disproportionate to any actual harm sustained by an aggrieved individual." 2001 Order, 198 F.R.D. at 383.  The disproportionate liability the Court was referring to was the availability of minimum statutory damages in the amount of $1,000 per violation of the Cable Act pursuant to 47 U.S.C. § 551(f).  The Court feared "a misuse of the procedural mechanism provided by a class action suit to turn what is fundamentally a consumer protection scheme for cable subscribers into a vehicle for the financial demise of a cable service provider that failed to comply with technical aspects of that scheme." 2001 Order, 198 F.R.D. at 384.[10]

Judge Newman, in his opinion concurring in the 2003 2d Cir. Decision, observed that the district court is seemingly forced to choose between granting class certification and exposing the defendant to damages at trial out of all proportion to the alleged harm – potentially running afoul of the Due Process Clause and legislative intent – or denying class certification and "rewarding

---

[10]    For an excellent discussion of the challenges posed by the aggregation of statutory damages in class action suits, see Sheila B. Scheuerman, Due Process Forgotten: The Problem of Statutory Damages and Class Actions, 74 Mo. L. Rev. 103 (2009).  Scheuerman argues that at the class certification stage, courts should consider the aggregate statutory damages that would result from a judgment in favor of the plaintiff class and deny certification if those damages were unconstitutionally "excessive" as that term has been interpreted by the Supreme Court in BMW v. Gore, 517 U.S. 559 (1996) and State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003). Those cases evaluated awards of punitive damages under the Due Process Clause and Scheuerman concludes that this established framework is the proper one to apply to aggregate statutory awards.

some law violators with liability for only a slight amount of total damages if, as seems more likely, few suits are filed." 2003 2d Cir. Decision, 331 F.3d at 26.[11]

Weighing these choices, Judge Newman suggests a third alternative of "determining that a class will be certified only up to some reasonable aggregate amount of damages," stating his view that "statutes are not to be applied according to their literal terms when doing so achieves a result manifestly not intended by the legislature." Id. at 28 (citing *inter alia* Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)).[12]  The unintended result here being the exposure of a company to billions of dollars in liability for technical violations of a statute resulting in little or no harm.  "Even if possible due process concerns or statutory construction to avoid a bizarre result not intended by Congress might not independently require limiting an aggregate statutory damages award, such considerations would seem appropriate to inform the customarily broad discretion of a district judge in the context of class certification." 2003 2d Cir. Decision, 311 F.3d at 28.

Here, the certification of a settlement class effectively implements Judge Newman's recommendation of setting a limit on damages.  However, rather than attempting to set a damages ceiling based on congressional intent, the limits of due process or the Court's own conception of a proper level of damages, the Court here accepts the parties' settlement as being

---

[11]    "A statutory penalty may violate due process where the penalty prescribed is "so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable." 2003 2d Cir. Decision, 331 F.3d at 26 (Newman, J., concurring) (citing St. Louis, I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919) ("That [the Due Process] clause places a limitation upon the power of the states to prescribe penalties for violations of their laws has been fully recognized, but . . . their enactments transcend the limitation only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.")).

[12]    For a thoughtful discussion of the authority of judges to deviate from clear statutory text when it application would otherwise produce absurd results, see John F. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387 (2003).

within such limits as these various considerations might impose.   Although the threat of class

certification for trial – characterized by the defendant as a "very narrow band of very grave risk [

] that informed the decision to settle the case" –  hung over the settlement negotiations, it can

nonetheless be fairly said that in a motion for class certification based upon a negotiated

settlement, concerns about the disproportionate impact of the class action form are answered so

long as the settlement is not unduly punitive and plainly within the defendant's ability to pay.[13]

The Court's concerns pertaining to the disproportionate impact of statutory damages in a

class action having been addressed, and the enumerated Rule 23(b)(3) factors having been

weighed, the Court finds that the superiority prong is satisfied.  For the foregoing reasons, the

Class is certified pursuant to Rule 23(b)(3).

## B.  Procedural Fairness: The Negotiation Process

"The District Court determines a settlement's fairness by examining the negotiating

process leading up to the settlement as well as the settlement's substantive terms." D'Amato, 236

F.3d at 85 (2d Cir. 2001).  The parties state that this Settlement Agreement "is the product of

---

[13]     Inherent in statutes which provide mandated damages to a potential class of millions for a violation for which actual damages would be difficult for any class member to prove, is the potential for causing financial ruin to a commercial defendant.  Class actions in such cases, more often than not, handsomely reward the lawyers bringing them and benefit the members of the class poorly.  Congress has addressed this problem in some statutes by capping damages in a class action at a certain dollar amount or as a percentage of the defendant's net worth, irrespective of statutory awards available in individual enforcement actions.  Scheuerman, Due Process, *supra*, at note 81 (listing statutes).

Another approach to avoid such uniformly criticized class action results would be for Congress, in enacting such statutes, to consider limiting the prosecution of such violations to public attorneys general, providing only for substantial monetary fines for their violation and such injunctive relief as is necessary.  The fines thus generated could be designated for the benefit of entities devoted to the study, prevention, cure or elimination of the wrong the statute was intended to address.  If, for example, it was the right of privacy, or consumer rights, or public health or the environment that was sought to be protected, the monies would be diverted to the body devoted to that area of endeavor.  The beneficiary meaningfully rewarded by that action would be society rather than class counsel and the individual class member recipients of a coupon or a token award.

extensive, supplemental arm's-length negotiations in addition to the negotiations that led to the Prior Settlement."  (Joint Prelim. Mem. 23.)

The Court accepts this characterization, given that, like the Prior Agreement, the Settlement Agreement here, "was a product of a long legal battle between Plaintiffs and Time Warner and was only arrived at after a committed litigation of the class claims, spanning, to date, eight years."  239 F.R.D. at 337.  Today, of course, the litigation has gone on for more than ten years.

Elsewhere in this order, the Court discusses the incentives inherent in class action settlements for class counsel to maximize their fees and for defendants to minimize their costs. This combination creates the risk that class counsel will collude with defendants to provide the class with a small settlement in exchange for inflated fees.   Indeed, the Court believes that the $5,000,000 in attorneys' fees and expenses negotiated by the parties exceeds the value of the direct benefits provided to Class Members.  See § II.E infra.  Although such circumstantial evidence of a collusive negotiation process should put the Court on its guard, it is insufficient to undermine the Court's conclusion that Class Counsel and the defendants did not act in bad faith.

## C.  Substantive Fairness: The Settlement Terms

The Court may only approve the terms of a class settlement "on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  In making such a determination, courts in this Circuit consider the following factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the

> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 117 (2d Cir. 2005) (citing City of Detroit v. Grinnell, 495 F.2d 448, 463 (2d Cir. 1974)).  In its consideration of these factors, "[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  Grinnell, 495 F.2d at 462 (*abrogated on other grounds*, Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 48 (2d Cir. 2000)).

In the Preliminary Approval Order, this Court noted that "the Court's conclusion that the previous settlement agreement was procedurally and substantively fair applies with equal force to the current agreement."  (Preliminary Approval Order 2.)  See 2007 Order, 239 F.R.D. at 336-38.  Accordingly, the Court will only briefly review the Grinnell factors, giving particular attention to the reaction of the class which was not known at the time preliminary approval was granted.

### (1)  Complexity, Expense and Likely Duration of the Litigation

The complexity of the litigation is evidenced by its long procedural history, which includes a motion to dismiss that was first granted and then denied upon reconsideration by Judge Korman in the 1999 Order,  the denial of class certification by this Court in the 2001 Order and the Second Circuit's decision to vacate and remand that decision in the 2003 2d Cir. Decision, the litigation of a subsequent motion for class certification that was overtaken by the

submission of the Prior Agreement, and the rejection of the Prior Agreement in the <u>2007 Order</u> which led to the current Settlement Agreement.

The expense of the litigation has almost certainly exceeded the benefit to the class members when one compares the requests for millions of dollars in fees by Class Counsel and counsel for the Objectors to the minimal benefits available to approximately half a million claimants.  As for the duration of the litigation, it has entered its eleventh year.  Were it to go to trial and subsequently be appealed, several more years of litigation would be likely.  This factor weighs in favor of settlement.

### (2) Reaction of the Class

As of November 23, 2008, the claims administrator, the Garden City Group, received 459,105 claim forms, <u>see</u> § I.B.2, *supra*.  The deadline for filing claim forms was March 10, 2009, three months after the Fairness Hearing, so it is possible that thousands of additional claim forms were received after the hearing date.  The parties tout the number of claim forms as evidence of the positive reaction of the Class, describing them as "figures in support" of the settlement that compare favorably to the 113 objections filed by the November 24, 2008, deadline and the 1,076 exclusions filed by the November 10, 2008, deadline.  (Joint Memorandum in Support of Final Approval of Revised Settlement dated December 3, 2008 ("Joint Mem."), 12.)  While the number of objections and exclusions constitutes only a small fraction of the Class, the Court does not attribute a great deal of significance to the number given the low stakes of a $5 settlement and the burden on each objector to provide their written

objections in triplicate, buy three stamps and mail copies to the Court, Class Counsel and defense counsel.[14]

The 459,105 responses, when compared to the number of Notices and postcards mailed to Category I, II, and III Class Members (7.2 million, of which 1.8 million were sent to persons with confirmed addresses), constitutes about 6.4% of the Class Members eligible for a direct benefit. Even if the number of responses rose to 550,000 prior to the March 10, 2009 deadline, a mere 7.6% of the Category I, II and III Class Members would be claiming a benefit.[15]

The 113 written objections cover a range of topics. A majority of the objections included complaints about the sufficiency of the settlement amount. A substantial minority of the complaints related to the proposed $5,000,000 fee for Class Counsel. The contrast of the $5,000,000 proposed attorneys' fee to the $5 cash compensation offer was not lost on many objectors. As one letter pithily stated: "Congratulations, for this we needed you? 5,000,000 for the lawyers 5 for me. Great." (Docket No. 204). Many objections expressed outrage at the practice of marketing private information and the attendant frustration of receiving unsolicited calls and mail pieces. One such objection stated simply, "I object to the settlement . . . on the grounds that none of the listed compensations are sufficient to assuage my anger for Time Warner selling my personal information to others so that I may be solicited." (Docket No. 287.)

---

[14]     The Court suspects that in class actions, class members would be better served if they were able to file claims, file objections and opt out over the internet. This would foster additional participation and feedback, facilitate the payment of claims and provide for greater scrutiny of the details of settlement agreements.

[15]     Class Counsel's use of 460,000 claimants in its November 2008 fee petition suggests that it did not anticipate a surge in the number of claimants prior to the March 2009 deadline. (Fee Mem. (defined in § II.E *infra*) 4.) As such, the Court assumes that 550,000 claimants is a generous estimate and will use this number elsewhere in this order for the purpose of establishing the value of the settlement.

Fourteen careful readers of the Notice objected specifically to the requirement that Class Members must shoulder the burden of cutting off any monthly service benefit to avoid being charged for its automatic continuation.  One of them characterized this benefit as a "promotional campaign, which resembles other promotions the company has offered for strictly profitable purposes, and which costs the company little while enticing increased business, [the plan] is the inverse of a penalty; and . . . hardly discourages misbehavior nor compensates the victims . . . ." (Docket No. 213.)  Another objector speculated that if the proposed settlement required that the monthly service benefit cut off automatically that "Time Warner would run away from this so quickly the vortex created by their departure would suck the entire court house into it!"  (Docket No. 230.)

Indeed, the Court is most troubled by this aspect of the Settlement Agreement, but two factors counsel against rejecting the settlement on this basis.  First, the Relevant Period ended more than ten years ago and the Court does not want to postpone relief any more than would be necessary to achieve an acceptable result.  Second, the Court has clearly articulated to Time Warner (and does so again here) the importance it places upon the clear and frequent notification of Class Members of their obligation to take an affirmative step to discontinue a monthly service benefit, and the Court's expectation that cancellation of the benefit will be simple and straightforward, eschewing lengthy wait times or intervening sales pitches.  One way to alleviate the Court's concerns would be the use of automated reminder calls to Class Members who selected a monthly service benefit that would give customers the option of ending the additional service with the touch of a button (as Time Warner's cable customers in this judicial district may in like manner confirm or cancel service calls).  Another approach would be to email Class

24

Members selecting a monthly service benefit with a link to a page that would enable them to effect the cancellation of the monthly service benefit online.

Finally, two objectors voiced their concerns at the Fairness Hearing.  Objector Bob Lamm suggested that Class Counsel should have its proposed $5,000,000 cash compensation substantially reduced and replaced with Time Warner Movies on Demand.  In addition, Lamm asked that the cash option be raised from $5 to $15.  Objector Franklin Conde complained about the settlement consideration and the proposed fees, voiced general dissatisfaction with service he has received from Time Warner and expressed his indignation that they may have sold his personal information, causing him to receive junk mail.

The objections to the settlement consideration and Class Counsel's fees voiced by Messrs. Lamm and Conde, together with the 113 objections submitted in writing, generally address two grievances that are familiar to judges presiding over class actions and to class action counsel, namely, the benefit to members of the class is too little and the fees awarded to counsel are too much.  Those grievances are inherent in the class action which is a policy device to "overcome the problems that small recoveries do not provide the incentive for any individual bring a sole action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually the attorney's) labor."  Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997) (citing Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997).

The concerns raised as to attorneys' fees and the amount of the settlement benefits are dealt with in greater detail in below.  In summary, the Court finds that the small amount of consideration is commensurate with the minimal harm to each Class Member, see § II.C(8-9),

25

and the Court has reduced attorneys' fees to a reasonable level, see § II.E.1, *infra*.  Taking into consideration the small number of objections and the careful consideration of them in this order, the Court finds that the response of the class does not weigh against approval of the settlement.

### (3) Stage of Proceedings and Amount of Discovery

This factor relates to whether the plaintiffs had sufficient information on the merits of the case to enter into a settlement, Cinelli v. MCS Claim Servs., Inc., 236 F.R.D. 118, 121 (E.D.N.Y. 2006), and whether the Court has sufficient information to evaluate such a settlement.  Wal-Mart, 396 F.3d at 118.  Here, the parties have engaged in discovery and have become apprised of the strengths and weaknesses of their cases through extensive motion practice and successive judicial decisions.  The settlement agreements were the product of protracted negotiation. Likewise, having given attention to this matter for nearly a decade, this Court has ample information to evaluate the merits of the settlement.  This factor also weighs in favor of approval.

### (4-6)  Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial

"In assessing the Settlement, the Court should balance the benefits afforded to the Class, including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation." In re Top Tankers, Inc. Sec. Litig., No. 06 Civ. 13761 (CM), 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008) (emphasis in original).  Here, the Class faced substantial obstacles to proving damages, having the Class certified for trial and establishing the defendant's liability. These risks weigh in favor of settlement.

As to establishing damages, the parties acknowledge that each plaintiff may be required to prove actual damages in order to trigger statutory damages.  See United States v. Chao, 540 U.S. 614 (2004).  In Chao, the Supreme Court held that under an analogous provision of the Privacy Act of 1974, 5 U.S.C. § 552a, a claimant may not recover the minimum statutory amount of $1,000 without making a showing of actual damages as a result of the violation.  Id. at 616.  A showing that a violation of the Cable Act caused actual damages to any particular Class Member is made extremely difficult by the fact that no records were kept as to which names from the LSDB were sold and which ones were not.  (2006 Joint Mem. 13.)  "Having one's name on an LSDB does not necessarily indicate that the person's information had been sold, since third parties purchased PII based upon sorting criteria, not the entire list."  2007 Order, 239 F.R.D. at 339, n. 28.

The 2006 Joint Memorandum, upon which the parties rely, indentifies several risks to establishing and maintaining the action as a class action for litigation.  This Court has previously rejected certification for trial, and its concerns about the propriety of certifying such a class in the future have already been aired.  See § II.A.1.c.ii supra.  The Second Circuit "acknowledge[d] Judge Glasser's legitimate concern that the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues."  Parker v. Time Warner, 331 F.3d 13, 22 (2d Cir. 2003).  Furthermore, the absence of litigated cases under the Cable Act means that there was little in the way of established precedent.  In the lone reported case where class certification was sought, Wilson v. Am. Cable Vision of Kansas City, 133 F.R.D. 573 (W.D. Mo. 1990), the court denied certification where violations of the Cable Act's notice provisions were deemed "technical in

nature".  (See 2006 Joint Mem. 10.)  Further, the defendant asserts that in the absence of the settlement agreement, it would have opposed class certification.

Although the plaintiffs survived a motion to dismiss the action, the hurdle of establishing the defendant's liability remains to be cleared.  The defendant's interpretation of the Cable Act validated all of its actions.  Time Warner maintains that the only data taken directly from its subscribers and sold to third parties were names and addresses, which is permitted by § 551(c)(2)(C)(i).[16]  According to Time Warner, the additional subscriber information was not obtained from subscribers, but from outside vendors, and subscribers were offered the opportunity to opt out of the LSDB.  Therefore, Time Warner argues, the dissemination of such additional subscriber information required neither the notification nor the consent of subscribers. "Because Congress was concerned with regulating only the use of information obtained from subscribers, the defendant argues that Congress could not possibly have intended to require a cable company to provide any notice regarding the nature and use of information collected from third parties." 1999 Order, 1999 WL 1132463, at *5.[17]

---

[16]         (2) A cable operator may disclose [PII] if the disclosure is –

         . . .

                  (C) a disclosure of the names and addresses of subscribers to any cable service or other
                  service, if –

                           (i) the cable operator has provided the subscriber the opportunity to prohibit or
                           limit such disclosure . . .

47 U.S.C. § 551(c)(2)(C)(i).

[17]         In denying Time Warner's motion to dismiss, Judge Korman found this line of argument to be at odds with the text of the statute:

         This argument ignores the plain language of section 551(a) which, at least, imposes an obligation
         on the cable service provider to disclose the nature and use it is making of the personally
         identifiable information "collected over the system or otherwise from the subscriber." (Def. Reply

**(7)  Ability of Defendant to Withstand a Greater Judgment**

Whether or not it would be warranted, the defendant could withstand a greater judgment. This factor weighs against approval of the settlement.  However, "[t]he fact that a defendant is able to pay more that it offers in settlement does not, standing alone, indicate the settlement is unreasonable or inadequate."  PaineWebber P'ships Litig., 171 F.R.D. at 129.

**(8-9)  Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

As the parties noted, the "outer limits of recovery in this litigation were very great." (2006 Joint Mem. 16.)  It was these outer limits that gave this Court pause when asked to certify a class at an earlier stage in this action and these outer limits which ran the risk of running afoul of the Due Process Clause.  2001 Order, 198 F.R.D. at 384.  Here, the plaintiffs have sought to certify a class consisting of all persons appearing on a recoverable LSDB, or approximately 7.2 million people.  Even constraining the outer limits of damages to the $1,000 statutory minimum per class member, the total would be in excess of $7 billion.  With the benefit of knowing that 459,105 claims have been filed, and assuming that the number of claims may have risen as high as 550,000 by the end of the claims period in March 2009, that outer limit is still an exorbitant $550 million.

---

Mem. at 12).  This defendant fails to do.  The fact that the ultimate enhancement of the personally identifiable information received from the subscriber could be accomplished in some other way without explicit notice to the subscriber may provide a statutory loophole that may not have been foreseen. Nevertheless, it does not provide a defense to a clear violation of section 551(a).

1999 Order, 1999 WL 1132463, at *6.

The value of the settlement is discussed at length in connection with the award of attorneys fees.  See § II.E.1, *infra*.  Here, it suffices to say that the Court values the settlement at $6.75 per claimant, the estimated cost to the defendant of providing claimants with a $5 check. A recovery of $6.75 is less than one percent of the $1,000 minimum statutory award.  The settlement consideration, relative to the minimum statutory damages, is therefore very small. However, it is not small relative to whatever negligible harm was imposed upon some portion of the Class by some additional amount of junk mail or unwanted phone calls.  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." Grinnell, 495 F.2d at 455.  "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  Id. at 455, n.2.

When considering the small settlement amount, it is also worth remembering that under § 551(c) of the Cable Act, it was not unlawful for Time Warner to sell the names and addresses of subscribers of "any cable service" (i.e. HBO, Disney, Playboy, etc.) so long as subscribers were alerted to this possibility.  Nor was it unlawful for the purchasers of such lists to obtain information from third parties, such as telephone numbers and demographic information to go with those names and addresses.  The only actions that were arguably in violation of the Cable Act were the enhancement of lists of the names and addresses of their subscribers by Time Warner without notice to those subscribers, and Time Warner's sale of those enhanced lists without subscriber consent.  It is entirely possible that squarely within the four corners of the law the Class Members would have had their names and addresses sold by Time Warner and enhanced with publicly available information by third parties, had Time Warner not elected to

augment the lists on its own.  Therefore, the damage to Class Members resulting from technical violations of the Cable Act is almost certainly negligible.  When the benefit is further placed in the context of the risks and delay of continued litigation detailed above, it is clearly within the range of reasonableness.

In considering the Settlement Agreement, the Court is mindful of the "strong judicial policy in favor of settlements, particularly in the class action context."  PaineWebber P'ships Litig., 147 F.3d at 138; Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982) ("The settlement of complex class action litigations are clearly favored by the courts.").  Accordingly, upon weighing the Grinnell factors, the Court finds the settlement amount to be fair and reasonable.

**D.  Distributional Fairness: The Plan of Allocation**

"To warrant approval, the plan of allocation must meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate."  Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002).  "Indeed, where a proposed settlement provides favorable treatment to some segment of the class, careful judicial scrutiny is required to prevent injustice and to 'ensure that the burden of settlement is not shifted arbitrarily to a small group of class members.'"  2007 Order, 239 F.R.D. at 337 (quoting Holmes v. Continental Can Co., 706 F.2d 1144, 1148 (11th Cir. 1983).

In the 2007 Order, this Court considered the differential treatment of persons in Categories I, II, III and IV, and held that the failure of the Prior Agreement to provide for consideration for the Category IV Class Members did not raise questions of distributional fairness because the Category IV Class Members could show no damages as their names were not found on any iteration of the LSDB.  2007 Order, 239 F.R.D. at 339. ("A claim which cannot

be proven is worth essentially nothing.  Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and adequate.")

In the same order, this Court held that the benefit accorded to Category III Class Members prevented a finding of distributional fairness.  Pursuant to the Prior Agreement, the Category III Class Members – persons whose names appeared in the LSDB but who no longer lived in an area serviced by Time Warner – would only receive the right to transfer the services benefit to someone who was living in an area serviced by Time Warner.  The Court explained, that the Category I, II and III Class Members

> are differentiated only by two characteristics – whether they are current or former subscribers, and whether they live in or outside an area currently serviced by Time Warner.  These differences have absolutely nothing to do with the merits of their claims.  There is absolutely no way to rationally distinguish between the *claims* of these three categories of plaintiffs . . . .  Even if the right to transfer a benefit is a benefit, it is clearly less valuable than the benefit itself.

2007 Order, 239 F.R.D. at 340 (emphasis in original).

To address this distributional inequity, the Settlement Agreement added the alternative of a $5 cash payment for all Category I, II and III Class Members.  Therefore, the only difference in benefits among these groups is that Category III Class Members, because of where they live, can only transfer the services benefits.  This alteration of the benefits mix is sufficient to alleviate the Court's distributional fairness concerns.  This method of allocation is fair and adequate, and is therefore approved.

**E.  Class Counsel's Fees and Expenses and Representative Plaintiffs' Incentive Awards**

Class Counsel requests attorneys' fees and expenses of $5,000,000.  (Plaintiffs'
Memorandum in Support of Petition for an Award of the Negotiated Attorneys' Fees and
Expenses dated Dec. 4, 2008 ("Fee Mem."), 1.)  In addition, Class Counsel requests awards of
$2,500 each for Representative Plaintiffs Parker and DeBrauwere.  (Fee Mem. 13.)  Any Class
Counsel fees and expenses authorized by the Court will be paid by Time Warner.  (Settlement
Agreement ¶ 26).  The requested fee award and awards for the Representative Plaintiffs are not
opposed by Time Warner.

**1.  Class Counsel's Fees**

Fed. R. Civ. P. 23(h) provides: "In a certified class action, a court may award reasonable
attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."
The practical difficulties of balancing the vindication of the rights of class members and fairly
compensating those attorneys that expend their time and labor to achieve that goal was recently
described in its stark reality by Judge Posner:

> The class action is an ingenious device for economizing on the expense of
> litigation and enabling small claims to be litigated. . . . But the class action device
> has its downside, or rather downsides.  There is first of all a much greater conflict
> of interest between the members of the class and the class lawyers than there is
> between an individual client and his lawyer.  The class members are interested in
> relief for the class but the lawyers are interested in their fees, and the class
> members' stakes in the litigation are too small to motivate them to supervise the
> lawyers in an effort to make sure that the lawyers will act in their best interests.
>
> The defendants in class actions are interested in minimizing the sum of the
> damages they pay the class and the fees they pay the class counsel, and so they
> are willing to trade small damages for high attorneys' fees, especially since, as
> Judge Friendly put it, "a juicy bird in the hand is worth more than the vision of a
> much larger one in the bush, attainable only after years of effort not currently

compensated and possibly a mirage." <u>Alleghany Corp. v. Kirby</u>, 333 F.2d 327,
347 (2d Cir. 1964).  The result of these incentives is to forge a community of
interest between class counsel, who control the plaintiff's side of the case, and the
defendants.  The judge who presides over the class action and must approve any
settlement is charged with responsibility for preventing the class lawyers from
selling out the class, but it is a responsibility difficult to discharge when the judge
confronts a phalanx of colluding counsel.

<u>Thorogood v. Sears, Roebuck and Co.</u>, 547 F.3d 742, 744-45 (7th Cir. 2008).

This action exhibits the tensions described by Judges Posner and Friendly.  To end the

litigation, the defendant and Class Counsel negotiated a settlement that purported to give Class

Counsel $5,000,000 and offered Class Members a small amount of cash or coupons for services

that they either could not use (in the case of Category III Class Members) or would not pay for at

retail prices (in the case of monthly services).  To discharge its responsibility to the Class, the

Court must discern the value of the settlement in order to avoid providing Class Counsel with

outsized fees that are not commensurate with the small benefit provided to Class Members as

compensation for the small harm they allegedly suffered.

**a.  The Common Fund Doctrine and Valuing the Settlement Agreement**

"[A] party that secured a fund for the benefit of others, in addition to himself, may

recover his costs, including his attorney's fees, from the fund itself or directly from the other

parties enjoying the benefit."  <u>In re Holocaust Victim Assets Litig.</u>, 424 F.3d 150, 157 (2d Cir.

2005) (citing <u>Savoie v. Merchants Bank</u>, 84 F.3d 52, 56 (2d Cir. 1996)) (internal quotation marks

omitted).  This principle is known as the common fund doctrine.  "The doctrine rests on the

perception that persons who obtain the benefit of a lawsuit without contributing to its cost are

unjustly enriched at the successful litigant's expense."  <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472,

478 (1980) (internal citations omitted).

In this Circuit, courts may calculate reasonable attorneys' fees from a common fund based either on the percentage of the recovery method or the lodestar method. Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 50 (2d Cir. 2000)). Under the percentage method, attorneys' fees are set by the court as a percentage of the fund. Under the lodestar method, the lodestar is arrived at by multiplying the hours expended by class counsel by appropriate hourly rates, and may then be adjusted by a multiplier determined at the discretion of the court, taking into consideration the contingent nature of payment, the quality of representation and the results achieved. In re Arakis Energy Corp. Sec. Litig., No. 95 Civ. 3431 (ARR), 2001 WL 1590512, at *15 (E.D.N.Y. Oct. 31, 2001).

A Second Circuit panel recently held that attorneys' fees awarded as a percentage of a common fund must take into consideration the entirety of the fund, not only that portion received directly by class members. Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 437 (2d Cir. 2007). In Masters, a fund of nearly $22 million was established, but only $9.34 million was claimed by class members. Id. at 428, 431. The settlement agreement left disbursement of the remainder of the fund to the discretion of the court. Id. at 428. Class counsel's request of fees and expenses was nearly $8.9 million. Id. The district court awarded $3.76 million in fees based on 40% of the value of claims made, rather than the entirety of the fund, separately allowing $1.6 million in expenses. Id. The Court of Appeals reversed, holding that: "The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available whether claimed or not." Id. at 437.

In the typical common fund case such as Masters, there is an actual fund, or at least a fixed amount of money representing the extent of the defendant's liability. Here, the Settlement

Agreement establishes neither; it simply provides that Time Warner will satisfy those claims that are made by eligible class members, while retaining any unclaimed benefits.[18]

In a similar case, the court in In re TJX Cos. Retail Security Breach Litig., distinguished Masters and decisions like it, noting that in such cases, "there was an actual common fund – whether created by settlement or judgment of the court – to which the percentage-of-the-fund method of determining attorneys' fees was applied.  In contrast, the Agreement here creates no fund; it simply provides that TJX will pay claims on an as-made basis, subject to certain caps." 584 F.Supp.2d 395, 403 (D. Mass. 2008).   The heart of the concern articulated by the TJX court is the risk that settlement agreements will be designed to give the appearance of the creation of a very large fund upon which fees may be based, frequently combined with low participation rates. Id. at 404-405.[19]

---

[18]     See also Strong v. Bellsouth Telecommunications Inc., 137 F.3d 844 (5th Cir. 1998).  (amounts of potential settlement benefits that go unclaimed by class members from the defendant do not constitute a portion of a common fund to be considered when awarding attorneys' fees).

[19]     The TJX Court relied and expanded upon observations of Justice O'Connor in connection with the Supreme Court's denial of certiorari in Int'l Precious Metals Corp. v. Waters, 190 F.3d 1291 (11th Cir. 1999) (attorneys' fees of $13.3 million awarded from $40 million fund from which only $6.5 million in claims were made, the balance of which reverted to defendants):

> We had no occasion in Boeing . . . to address whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class.  The approval of attorney's fees absent any such inquiry could have several troubling consequences.  Arrangements such as that at issue here decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery.  They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class.  And they could encourage the filing of needless lawsuits where, because the value of each class member's individual claim is small compared to the transaction costs in obtaining recovery, the actual distribution to the class will inevitably be minimal.

International Precious Metals Corp. v. Waters, 530 U.S. 1223 (2000) (internal citations omitted) (case was not appropriate for certiorari because petitioners had previously waived the right to challenge the fee award).  In Boeing v. Van Gemert, 444 U.S. 472 (1980),  the court "upheld an award of attorney's fees in a class action where the

> In any given case, class member nonparticipation may be attributed to a variety of factors: an ineffective notice program that fails to make class members aware of their rights, unappealing benefits that do not provide sufficient incentive for class members to invest the effort to submit a claim, or a claims process that is confusing, time-consuming, or requires class members to submit documentation or information they are unlikely to have in order to obtain relief . . . . in a reversionary common fund or claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees.

Id.

Many of the concerns raised in TJX regarding the small likelihood that claims would be filed are present here.  Chief among them is the difficulty of contacting Category II and III Class Members, the former Time Warner Subscribers.  Of the 7.2 million Category I, II and III Class Members, current addresses were found for only 1.8 million.  The remaining class notifications were mailed to addresses where former subscribers lived at least a decade ago because their information could not be updated.  On this basis alone, it was clear from the outset that the response rate would only be a small fraction of the 7.2 million Class Members entitled to a direct benefit.[20]

Here, as in TJX, the extent of the defendant's liability is wholly dependant upon the number of claims, the cost of administering the settlement and such fees and expenses as are assessed by the Court.  Class Counsel characterizes the Settlement Agreement as having created a common fund, the size of which is a function of the number of claims and the value of such

---

award was based on the total fund available to the class rather than the amount actually recovered," Waters, 530 U.S. at 1223, but explicitly reserved decision as to "whether a class-action judgment that simply requires the defendant to give security against all potential claims would support a recovery of attorney's fees under the common-fund doctrine." Boeing, 444 U.S. at 481.

[20]     The Court also is skeptical about the effectiveness of publication notice.  Even if magazines such as Better Homes & Gardens and Reader's Digest have millions of subscribers and multiple persons see each copy, as represented by the "pass-along" rate (Finegan Aff. ¶ 14-17), the suggestion that most readers even turn to the page containing the legal notice, let alone take the time to read its inevitably unadorned small print strains credulity.

claims.  (Fee Mem. 4.)  This conception of a common fund does not indulge the temptation to claim fees as a proportion of the full recovery that could theoretically be made by all 7.2 million class members.  Rather, it takes an approach that has been adopted in other cases where the liability of the defendant is a function of the claims made pursuant to the settlement, not the establishment of a fixed fund.  Steinberg v. Nationwide Mut. Ins. Co., No. 05 Civ. 3340 (ADS), 2009 WL 1262747, at *3 (E.D.N.Y. May 5, 2009) (where settlement provides for direct payment of claims, amount paid into a common fund is unknown until such claims are made); In re Washington Mutual Respa Fee Litig., Nos. 02 Civ. 5922, 04 Civ. 4322 (SMG), 2009 WL 749933, at *1 (E.D.N.Y. Mar. 17, 2009) (court evaluated the size of the fund on the basis of claims made, not the potential liability to the entire class).

This approach is also consistent with provisions of the Class Actions Fairness Act of 2005 ("CAFA") relating to coupon settlements, which provides:

> (a) Contingent fees in coupon settlements. -- If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are *redeemed*.

28 U.S.C. § 1712 (emphasis added).  Under CAFA, any fund against which attorney fees are measured or assessed that is based on the underlying value of coupons may only include those coupons that are redeemed.  Here, although the services benefits are almost certainly coupons under CAFA, the statute is inapplicable because the action was commenced prior to its passage. See Pub. L. No. 109-2, § 9 (2005).

The Court agrees that the settlement should be valued on the basis of the number of claims that were made against it, but differs with Class Counsel as to the proper valuation of

those claims.  Class Counsel asserts that a "conservative estimate of the total value of the

[Settlement Agreement] is in the range of $14-22 million."  (Fee Mem. 4.)  The low end of the

estimate was based on (1) 460,000 claims and (2) an assumption that 50% of the claimants

would choose service benefits valued on average at $50 and 50% of the claimants would seek an

award of free movies which have a retail price of $8, while (3) very few claimants would take

the $5 benefit based on the fact that of the 286,500 former claimants under the 2006 Proposed

Settlement, only 11,325 requested the cash benefit.  (Fee Mem. 4-5.)[21]  The high end of the

estimate was based on 450,000 claimants choosing only service benefits with an average value of

$50.[22]  (Fee Mem. 5.)

The settlement values described in Class Counsel's fee memorandum are problematic.

The Court has been given only a few pieces of information from which it could infer the benefit

mix chosen by those Class Members making claims, and finds the valuations given to the

services benefits to be overstated and unreliable.[23]

---

[21]        This formulation adds up to only $13.34m.

[22]        This formulation adds up to $22.5 million.

[23]        Plaintiffs' Memorandum in Support of Petition for an Award of Attorneys' Fees and
Reimbursement of Expenses dated May 12, 2006 ("2006 Fee Mem.") submitted in connection with the Prior
Agreement, also claimed that a "very conservative estimate of the total value of the benefits ranges from $14 to $22
million, depending on the mix of benefits selected by the class."  (2006 Fee Mem. 4.)  That estimate was based on
(1) 270,000 claims (2) applying the "double benefits" feature of the Prior Agreement (described below), and (3)
assuming (using the "doubled" benefits) that 50-75% of the claimants would select free movies with a retail price of
$16 and that 25-50% of the claimants would select service benefits with an average value of $150.  (2006 Fee Mem.
at 4-5.)  The "double benefits" took effect if the response rate was below 7% of Category I, II and III Class
Members.  This feature was eliminated from the Settlement Agreement as a concession in exchange for the option of
a cash benefit.  (Objector Fee Opp. Mem. 9.)  Class Counsel offers no reason for the reduction of its estimate of the
value of a month of services from $75 per month in 2006 to $50 in 2008.  This disparity reinforces the Court's sense
that the figures used by Class Counsel are arbitrary and unreliable.

Class Counsel's approach is also inconsistent with Time Warner's statement at the Fairness Hearing that
"as of today, approximately 25% of the claims have been for the $5, 75% for services.  I'm not sure what the
breakdown is between services, incremental service versus a Movie on Demand."  (Fairness Hearing Tr. 79.)

The retail price of the service benefits overstates their value to customers.  If the economic value to Class Members of a free month of HBO was its retail price of $12.95 per month (Settlement Agreement ¶ 6), those Class Members would already be paying for it.  Rather, they must value it at something less than its retail price.  Likewise, the retail price of the benefits are not reflective of their cost to Time Warner to provide.[24]

Given the speculative and self-serving nature of Class Counsel's estimates of the value of the service benefits and the absence of any reliable evidence on the value of these service coupons to the customers, the Court is left to its own devices in valuing the settlement.[25]  Any valuation of the claims made by Class Members is speculative without knowing: the number of Class Members making claims; the mix of benefits they have chosen; and the subjective value of the service benefits to Class Members.  In addition, adjustments to such valuation should be made for the risk to Class Members of failing to cancel services that they do not wish to pay for and the inconvenience of cancelling them.

---

Assuming that the defendant was referring to all 459,105 claims filed as of that date, more than 100,000 people chose the cash benefit, including a majority of those 172,602 claimants responding to the 2008 settlement notice who were not Former Claimants.  If this is the case, clearly the number of Class Members opting for the $5 cash option is non-trivial.

[24]    See generally Lawrence W. Schonbrun, Class Actions: The New Ethical Frontier, Civil Justice Memo (Manhattan Inst. Center for Legal Pol'y Research, New York, N.Y.) (Nov. 30, 1996), available at http://www.manhattan-institute.org/html/cjm_30.htm.  ("[A]s economists know, the true economic value of a coupon to its recipient, or true economic cost to its issuer, are by no means equivalent to its face value. If it were, the Sunday-paper supplements containing $100 worth of coupons would be as valuable as a $100 bill. Many customers never cash in coupons, and others who do are actually bringing a net profit to the issuer who would not otherwise have gotten their business.")

[25]    CAFA, were it applicable, permits the Court "in its discretion upon the motion of a party" to receive expert testimony on the actual value to class members of coupons that are redeemed.  28 U.S.C. § 1712(d).  No motion was made to provide such testimony.

Even with these uncertainties, the Court can draw some inferences about the value of the settlement to Class Members based on the characteristics of the Category I, II and III Class Members.  The fact that few of the Former Claimants changed their benefit selection from services to cash suggests that the value of the services benefit to Category I Class Members – current Time Warner Cable subscribers – is likely to be greater than $5.[26]  This should not be surprising since current subscribers can most easily use the services benefits.  That said, a Former Claimant's preference for the cash option also may have been overcome by the burden of obtaining and completing a new claim form.  The value of the settlement to the majority of Category III Class Members is almost certainly $5 because their only alternative to taking the cash option is to transfer the services benefit to someone in another community that is served by Time Warner Cable.  Lastly, there are the Category II Class Members who live in communities served by Time Warner Cable, but who do not currently subscribe to its services.  While some may eagerly sign up for a free month of new cable service which could carry a retail price upwards of $120 (Settlement Agreement ¶ 6), it is likely that the majority of these persons already have other cable service or are not interested in cable, making the value of the settlement for most of them equal to the $5 check.

Taking into consideration the characteristics and incentives facing different categories of Class Members, and in recognition of the uncertainties inherent in valuing the settlement, the Court finds that the claims component of the common fund is most fairly valued at $6.75 per claimant.  This figure comprises the cash benefit option of $5 plus the $1.75 cost of providing

---

[26]    While some Former Claimants are not Category I Class Members, it stands to reason that most of them are because only Category I Class Members received direct notice mailed to their homes in connection with the Prior Agreement.

each \$5 check.[27]  The cost to Time Warner of the service benefits is almost certainly less than or

equal to \$6.75.  If the cost of providing service benefits was greater than the \$6.75 cost to

provide the cash benefit, Time Warner would not have fought against having a cash option, a

point that was stressed by Class Counsel:

> Plaintiffs' had made exhaustive efforts to obtain such a cash benefit before, in
> negotiating the original settlement, but were unable to do so. . . . In order to obtain
> the additional cash benefit for the Category III class members, Plaintiffs' Counsel
> had to reduce the benefits to Categories I, II, and III by foregoing the doubling of
> services benefit.

Memorandum in Opposition to [the Objectors'] Motions for Attorneys' Fees and Expenses dated

December 4, 2008 ("Objector Fee Opp. Mem."), 9.)  From Time Warner's perspective, the

Settlement Agreement promotes Movies on Demand and monthly services to customers and

enables Time Warner to collect some fees from Class Members who are insufficiently

punctilious in cancelling them.  At a minimum, the marketing benefit to Time Warner of the

service benefit options presumably outweighs any cost to them above \$6.75.  Otherwise, Time

Warner would have embraced such a cash option as a cost effective alternative to the services

benefits.

The total value of the settlement ("Settlement Value") in this case consists of the value of

the benefits claims and cy pres relief, the awarded legal fees and expenses and administrative

costs.  Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 245-46 (8th Cir. 1996) ("The award to

the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid

---

[27]        "If [the claims administrator] was asked to mail a check to Class Members, the total cost
(including banking fees, printing, packing, postage, and the costs associated with an explanatory letter) would likely
be greater than \$1.75 per check."  (Affidavit of Jennifer M. Keough dated May 14, 2006 ("Keough Aff."), ¶ 10.)

directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery.")[28]

Assuming that there are 550,000 claimants, the total value of their claims is $3,712,500.  If the

amount of the fund is increased by the cy pres relief of $500,000 and administrative costs of

around $3 million[29], the Settlement Value can be estimated at $7.2 million plus the attorneys'

fees and expenses awarded by the Court.

### b.  The Percentage and Lodestar Methods

"The trend in this Circuit is toward the percentage method, which directly aligns the

interests of the class and its counsel and provides a powerful incentive for the efficient

prosecution and early resolution of litigation.  In contrast, the lodestar creates an unanticipated

disincentive to early settlements, tempts lawyers to run up their hours, and compels district

courts to engage in a gimlet-eyed review of line-item fee audits."  Wal-Mart, 396 F.3d at 121

(internal citations and quotation marks omitted).  "[T]he lodestar remains useful as a baseline

even if the percentage method is ultimately chosen."  Goldberger, 209 F.3d at 50.

---

[28]       Although other remedial relief in the form of changes to the privacy notice, the appointment of a
Chief Privacy Officer and Class Counsel's ongoing responsibility to monitor the defendant's privacy practices were
included in the Settlement Agreement, the value of these essentially cosmetic steps is minimal.  Even in its own
calculations, Class Counsel does not assign a value to this component of the Settlement Agreement for the purpose
of establishing its overall value, but merely suggests that it "further demonstrates the value of the Revised
Settlement to the entire class."  (Fee Mem. 11.)  See Staton v. Boeing, Co., 327 F.3d 928, 974 (9th Cir. 2003)  ("only
in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can
be accurately ascertained may courts include such relief as a part of the value of a common fund . . . . courts should
consider the value of the injunctive relief obtained as a 'relevant circumstance'  in determining what percentage of
the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself.") (cited in In
re Excess Value Ins. Coverage Litig., 598 F.Supp.2d 380, 387 (S.D.N.Y. 2005)).

[29]       As of April 4, 2006, the Garden City Group had billed Time Warner Cable approximately $1.4
million in administrative costs, including printing and postage costs of $600,000.  (Keough Aff. ¶ 10.)  In the claims
administrator's affidavits accompanying the Joint Prelim. Mem. and the Final Approval Mem., these costs were not
updated, but in view of the fact that more than three years have passed and the process of printing and sending
notice was repeated and the process of sending checks to certain claimants is still to come, the Court estimates that
total administrative costs will be approximately $3 million.

While the percentage method provides the correct incentives for Class Counsel and generally is preferable, its application in this case is made difficult by the inherent uncertainty in valuing a settlement where the number of claims and mix of benefits is unknown.  When awarding attorneys' fees in settlements sharing characteristics with this one, district courts in this circuit have taken different approaches in deciding what method to apply.  In In re Excess Value Ins. Coverage Litig., the court found that the percentage method was appropriate where the lodestar substantially exceeded the value to the class of the settlement.  598 F.Supp.2d 380, 386 (S.D.N.Y. 2005) (counsel's proposed lodestar of $6.9 million exceeded $4.9 million value of coupons redeemed by class).  Here, Class Counsel's proffered lodestar of $5,289,781.25 is both greater than the negotiated fees and expenses of $5,000,000 and greater than the estimated value of the claims made by class members of $3,712,500.  In Steinberg v. Nationwide Mut. Ins. Co., however, the lodestar method was applied because the percentage method was found to be unworkable where "the exact amount paid into the common fund is as yet undetermined."  No. 05 Civ. 3340 (ADS), 2009 WL 1262747, at *3 (E.D.N.Y. May 5, 2009).  Here, the number of claimants and the mix of benefits is unknown.

In considering Class Counsel's fee request, the application of a traditional lodestar method alone, with its blind reliance on Class Counsel's vague reports and the false precision of quarters and tenths of hours fails to be a useful tool for evaluating the effectiveness and utility of Class Counsel's services without the perspective provided by comparing the lodestar to the entire Settlement Value.   In view of these concerns, the Court elects to apply both the lodestar method and the percentage method to take into account both the uncertainty inherent in estimating the size of the fund and to guard against a lodestar award out of all proportion to the settlement

44

benefits.  In effect, the Court will use a percentage of the fund it has estimated at 7.2 million plus attorneys' fees and expenses as a backdrop for evaluating and adjusting Class Counsel's lodestar.

**c.  The <u>Goldberger</u> Factors**

In applying either the lodestar or the percentage method, district courts in this Circuit are guided by the following criteria in awarding reasonable attorneys' fees:  "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  <u>Goldberger</u>, 209 F.3d at 50.

**(1)  Time and Labor Expended by Counsel**

Class Counsel submits that 12,123.40 hours were expended in this action by attorneys, paralegals and staff, with a lodestar of $5,289,781.25.  (Declaration of George Samson dated December 4, 2008, Ex. 1.)  These hours were spread among more than 20 attorneys and 10 paralegals and staff at four different law firms, at an average hourly rate of $436.  Excluding paralegal and staff time, the hourly rate for all attorneys averaged $513 for approximately 9500 hours.  The paralegal and staff hourly rates averaged $161 for approximately 2600 hours.

Class Counsel's submissions chronicle the various tasks and episodes in the "long trench warfare" of this litigation, (Fairness Hearing Tr. 42), including pre-filing research, an initial motion to dismiss that was granted from the bench and then reconsidered in the <u>1999 Order</u>, discovery, a motion to deny class certification, an appeal of the denial of certification of a damages class to the Second Circuit resulting in a remand, the negotiation and rejection of the

Prior Agreement by this Court and this motion for the approval of the present Settlement Agreement.  (Fee Mem. 1.)

At the Fairness Hearing, the Court expressed surprise at the number of hours that were submitted by Class Counsel, (Fairness Hearing Tr. 43), and concern over the efficiency of dividing the work among four law firms, only one of which is located in New York City. (Fairness Hearing Tr. 34-35 ("How did it happen that the two plaintiffs, who are residents of New York City, are represented by lawyers from Seattle, Washington and Washington, D.C.?")) After assurances from representatives of the four law firms regarding the minimal overlap and efficiency with which the case was prosecuted, the Court requested additional information from Class Counsel detailing the allocation of work among the firms.  Their submission did not allay the Court's concerns.

Although the Court cannot realistically evaluate the appropriateness and efficiency of each hour spent, a review of Class Counsel's submissions demonstrate that the 12,123.4 hours devoted to this litigation was excessive.  A few examples of apparent inefficiencies are illustrative.  In contesting the defendant's motions to dismiss the plaintiffs' initial and amended complaints, Class Counsel spent more than 1900 hours between August 1998 and November 1999.  (Plaintiff's Supplemental Submission in Support of Application for Attorneys' Fees dated January 9, 2009 ("2009 Fee Mem. Supp."), 6-9.)  In opposing the defendant's motion to deny class certification (including objections to the Magistrate Judge's Report and Recommendation and an appeal to the Second Circuit) Class Counsel spent 3100 hours between January 2000 and June 2003, more than 1100 hours of which were spent preparing the opposition brief and arguing the motion before the district court.  (2009 Fee Mem. Supp. 12-20.)  On its own motion for class

certification, Class Counsel spent an additional 1500 hours between February 2004 and January 2005.  (2009 Fee Mem. Supp. 22-26.)

As to overlap among the four firms representing the class, Class Counsel's supplemental submission raises more questions than it answers.  The spotty documentation provided in the 2009 Fee Memorandum Supplement suggests overlap and waste.  To take one example, Class Counsel reported spending 700.7 hours from January to March 2000 on "Opposition to Defendants' Motion to Deny Class Certification."  The role of the Hagens Firm was to "Coordinate and draft opposition to the motion," the Cuneo Firm was the "Lead Researcher and Drafter" and the Kirby Firm was the "Co Primary".  (2009 Fee Mem. Supp. 12-13.)  Far from demonstrating a clear division of labor, this entry portrays three of the four firms in loosely defined leadership roles, with each billing approximately 200 hours to draft the same document. In addition, and without any explanation of its role, the Beaulaurier Firm billed more than 100 hours.  The entry "Preparation for Hearing and Hearing on Defendants' Motion to Dismiss" in April 1999, provides another example.  The Hagens Firm was listed as being the principal advocate, while no description of the role of the Cuneo Firm was provided.  Nevertheless, the Hagens Firm billed only 72 hours under the entry while the Cuneo firm billed 159 hours.

The most troubling example of poor documentation was the minimal detail provided as to what role the Cuneo Firm played.  Only the entries accompanying 1200 of their 4000 hours provide any description whatsoever as to the role that they played, often taking the form of just one or two words of ambiguous import.  For the largest time entry of the entire submission, 1355.25 hours from June 2003 to April 2004 for "Assessment of the Second Circuit Decision, Remand, Resumption of Discovery, Depositions, Document Review, Third Party Discovery,

Discovery of Plaintiffs, and Discovery Disputes," no explanation of the role of any firm in any of the tasks listed is provided.

Perhaps some of the foregoing examples could be explained by the exigencies of the case, but when they are taken together, the only plausible conclusion short of outright bill padding is that inefficiencies and overlap substantially increased the number of hours billed by Class Counsel, requiring a reduction of their lodestar.

The Court also views the hourly fees of Class Counsel warily.  The average hourly fee billed by attorneys was $513, with average attorney rates for each of the four firms at $400 for the Beaulaurier Firm, $431 for the Hagens Firm, $567 for the Cuneo Firm and $574 the Kirby Firm.  The main reason for the high average hourly fee appears to be the use of partner-level attorneys charging $400 or more per hour, accounting for more than 85% of the attorney hours. The Court assumes that such attorneys are partners and refers to them as such.  For partners, the average hourly fee is $545.  The average fee for associates for less than 15% of the hours is $330.  It is not clear to the Court why the vast majority of the work in this case was done by partners when much of it could have been done less expensively by associates.[30]

Class Counsel argues that current rates should apply for all attorneys that billed on the case.  (Fee Mem. 7.)  The Court finds it noteworthy that such current rates rose from an average of $422.27 per attorney hour in the 2006 Fee Memorandum to $513.10 per attorney hour in the 2008 submissions, an increase of 21.5%.  Here, where more than 87% of the hours were billed by September 2006, more than three years ago, the application of current rates is not appropriate.

---

[30]        The Court understands that over the course of the eleven year case some associates may have become partners.  This, however, also raises the question of whether it is appropriate to bill work done by an attorney as an associate at current partner rates.

In this Circuit, "historic rates should be used in multi-year cases so as to avoid windfall awards". In re PaineWebber Ltd. P'ships Litig., No. 94 Civ. 8547 (SHS), 2003 WL 21787410, at *3 (S.D.N.Y. Aug. 4, 2003) (citing New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir. 1983). Finally, the Court observes that nearly 1000 hours included in Class Counsel's lodestar was for work performed after the denial of final approval in the 2007 Order.

### (2)  The Magnitude and Complexities of Litigation

This case presented several complexities and, as a class action with millions of class members, is of considerable magnitude. The Court's description of the obstacles to certifying such a large class of persons seeking statutory damages and the remaining risks of litigation described in § II.A.1.c.ii *supra* and § II.C(4-6) *supra* summarize many of the complexities of this case. The novelty and complexity of some of the legal issues, however, is mitigated by the fact that the universe of pertinent cases and statutes is limited and there was no trial or trial preparation required for the action.

### (3)  Risk of Litigation

This factor is intended to recognize that cases taken on a contingent fee basis entail risk of non-payment for the attorneys that prosecute them, and it embodies an assumption that contingency work is entitled to greater compensation than non-contingency work.

Even after ten years of litigation, the outcome in this case, had it gone to trial, was uncertain. It remains in dispute whether violations of the Cable Act even took place, let alone whether a class could be certified or what a reasonable and constitutional quantum of damages may look like. As such, the risk of nonpayment was significant.

49

### (4)  Quality of Representation

The four firms comprising Class Counsel were experienced in class actions and provided adequate representation in their appearances and in writing.

### (5)  The Requested Fee in Relation to the Settlement

In support of the requested fee of $5 million, Class Counsel states that because the fee represents an amount less than its lodestar and expenses, it is "obviously" reasonable.  (Fee Mem. 2.)  When compared to the benefits claimed by Class Members, however, its reasonableness is not so obvious.

Ordinarily in common fund cases, attorneys' fees under the percentage of the fund method are expressed as a fraction of a common fund from which the payments to claimants, the cost of administration of the settlement, attorneys' fees and expenses and plaintiff incentive awards are drawn.  Although the Settlement Agreement sets aside no fixed fund, the Court has already estimated the Settlement Value at approximately $7.2 million plus attorneys' fees and expenses.  See § II.E.1.a *supra*.  Were the requested $5,000,000 in attorneys' fees and expenses granted, not only would they exceed the value of the direct benefits to Class members, but such fees would constitute more than  41% of this hypothetical $12.2 million fund.

### (6)  Public Policy Considerations

Over the course of more than a decade Class Counsel has logged over 12,000 hours to achieve a final result that evokes ambivalence.  The alleged wrongs of Time Warner – technical violations of the Cable Act – were essentially righted long ago when the company changed its privacy notice and discontinued its list sales business.  However, the litigation continued for

eight years as a quest for some measure of direct compensation for the Class Members, the vast

majority of whom were all the while oblivious to the purported violations and essentially

unharmed by them.  The words of Judge Posner in another recent case are again apt:

> The lawyers for the class could not concede the utter worthlessness of their claim
> because they wanted an award of attorneys' fees.  The lawyers for [the defendant]
> were reluctant to argue the utter worthlessness of the claim because they were
> able to negotiate a settlement that cost their client virtually nothing – provided
> they did not take such a strong stand that it jeopardized the class lawyers' shot at a
> generous award of attorneys' fees, and hence the settlement.  And the objectors
> were motivated to exaggerate the value of the claim . . . so that they could get a
> generous award of attorneys' fees.

Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 686-87 (7th Cir. 2008).  While the Court does not

mean to suggest that the Representative Plaintiffs' claims were legally meritless, "worthless" is

not far off the mark as a description of their actual damages.

    To end the litigation, the parties finally settled.  At worst, even if Time Warner did not

benefit from the coupon portion of the settlement, it did not stand to lose much either as notice

was only sent directly to less than two million current subscribers and printed in the back of

some magazines.  As for the Class Members, to be sure some of them will be delighted to have a

free month of movie channels that they otherwise could not or would not pay for, or receive a $5

check, but the vast majority of Class Members have never heard of this settlement or did not care

enough to make a claim.  The only clear winners in this action appear to be Class Counsel.  For

its efforts, Class Counsel will be the beneficiary of millions of dollars from the coffers of a large

corporation and the pockets of its customers, while a small percentage of the Class Members

collect $5 checks, a couple of movie viewings or a month of new television choices.

As a matter of public policy, it would be unseemly for the rewards to Class Counsel to exceed those to Class Members, the ones for whom the litigation is ostensibly contested.  Arakis Energy, 2001 WL 1590512, at *14; Excess Value, 598 F.Supp.2d at 390 ("It would be anomalous and unacceptable for counsel to fare better than the Class").  "[A]ttorney's fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." New York State Assoc. for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir. 1983) (internal quotations and citations omitted).  "The allowance of attorneys' fees in an amount greater than the sum actually claimed by the class from the reversionary fund seems, *prima facie*, to create a windfall for the attorneys".  Arakis Energy, 2001 WL 1590512, at *14.

**d.      Class Counsel's Lodestar**

Taking all of the Goldberger factors into consideration, the Court is compelled to reduce Class Counsel's fee request to a level that does not offend pubic policy and that takes into account the high hourly rates and the excess and duplicative hours spent.

In so doing, the Court will view Class Counsel's fee and expense request as having three components:  attorneys' lodestar totaling $4,863,888.75, paralegal and staff lodestar totaling $425,892.50 and expenses totaling $183,898.87 (Fee Mem. 2, n.3).  Putting expenses to one side, the Court will first consider the lodestar figures.

There are several ways to address the lodestars that are directly responsive to the Court's concerns.  The excess hours can be addressed simply by reducing the number of hours taken into consideration, either by taking a percentage reduction or by targeting certain time entries, such as the time spent on correcting the infirmities of the Prior Agreement.  The excess rates may be

addressed by reducing the rates themselves for some or all of the life of the action, adjusting the

mix of time charged at partner, associate and staff rates, or both.

The Court may, in its discretion, reduce class counsel's lodestar by making percentage

reductions in cases with voluminous fee applications insofar as it is unrealistic to evaluate and

rule on every entry in an application.  Carey, 711 F.2d 1136.  Carey, one of this Circuit's

foundational cases on attorneys' fees, considered the question of what rates should be applied to

fee applications that cover a period of many years:

> [H]istoric rates do not reflect inflation or the cost of forgone interest, and,
> therefore, undercompensate prevailing parties. . . .  [C]urrent rates, in contrast,
> incorporate inflation into fee awards.  But the incorporation is imprecise and can
> overcompensate prevailing parties. . . .
>
> We conclude that historic rates should be used . . . in setting fee awards in multi-
> year cases. . . .  [W]e are reluctant to impose upon district courts an added burden
> of ascertaining precise year-by-year figures in every case.  If the services were
> rendered over two or three years, relevant figures for the current year will
> normally still be appropriate.  Even in protracted cases, it will be sufficient to
> divide the litigation into just two phases and use one rate for the early phase and a
> current rate for the later phase.

Carey, 711 F.2d at 1152-53.

To prevent Class Counsel from being unduly rewarded with current rates when the vast

majority of work on this case occurred several years ago, the Court applies a reduced rate to the

early part of the case.  The 10,660 hours billed from prior to the filing of the original complaint

in 1998 to the hearing on the motion for preliminary approval of the Prior Agreement in

September 2005 (the "Early Period") will be billed at 75% of current rates for the purposes of

establishing the appropriate lodestar.  See PaineWebber, 2003 WL 21787410, at *3 (fees for

services rendered in the years 1997-2000 credited at 2/3 of proffered rates while fees for services

rendered in 2001-2003 credited as proffered).  Therefore, the rates presented in the November

2008 fee application are applied to approximately the last three years of the action following the Early Period (the "Current Period").[31]  This reduces the hourly rate for those hours billed during the Early Period from $544.53 to $408.39 for partners, from $330.10 to $247.57 for associates and from $161.08 to $120.81 for staff.  As shown in the table below, the application of Early Period and Current Period rates to all 12,223.4 hours yields an adjusted lodestar of $4,126,966.

|  | Partners | Associates | Staff | Total |
|---|---|---|---|---|
| **Total hours** | 8,090.15 | 1,389.25 | 2,644.00 | 12,123.40 |
| **Proportion of hours by position** | 66.73% | 11.46% | 21.81% | 100% |
| **Current Period hours (prorated by position)** | 976.55 | 167.69 | 319.15 | 1,463.40 |
| **Current rates** | $544.53 | $330.10 | $161.08 | -- |
| **Early Period hours (prorated by position)** | 7,113.60 | 1,221.56 | 2,324.85 | 10,660.00 |
| **Early Period reduced rates** | $408.39 | $247.57 | $120.81 | -- |
| **Lodestar adjusted for historic rates** | $3,436,912.57 | $357,782.43 | $332,271.22 | $4,126,966.22 |

To account for excess hours charged as a result of overlap or inefficiency, the Court cuts 20% of the 12,123.40 hours in each of the early and late billing periods, reducing total attorney hours from 9479.4 to 7583.5 and staff hours from 2644 to 2115.2.  As shown in the table below, the resulting adjusted lodestar is $3,301,572.97.

---

[31]     The Court assumes that the ratio of partner, associate and staff hours is the same during the Early Period and the Current Period, notwithstanding the likelihood that current partners may have worked on the case as associates in the past and that the ratio of partner hours to associate hours in this case is unusually high.  These assumptions work to the benefit of Class Counsel by applying partner rates to  more than 85% of the attorney time.

| | Partners | Associates | Staff | Total |
|---|---|---|---|---|
| **Reduced Current Period hours** | 781.24 | 134.16 | 255.32 | 1170.72 |
| **Reduced Early Period hours** | 5690.88 | 977.24 | 1859.88 | 8528.00 |
| **Lodestar adjusted for reduced hours and historic rates** | $2,749,530.06 | $286.225.94 | $265.816.97 | $3,301,572.97 |

### e.  The Lodestar Multiplier

When deciding whether to apply a multiplier to a claimed lodestar, the court should consider the following factors:  "(i) the contingent nature of the expected compensation for services rendered; (ii) the consequent risk of non-payment viewed as of the time of the filing of the suit; (iii) the quality of representation; and (iv) the results achieved."  Arakis Energy, 2001 WL 1590512, at *15 (citing Varljen v. H.J. Meyers & Co., Inc., No. 97 Civ. 6742 (DLC), 2000 WL 1683656, at *4 (S.D.N.Y. Nov. 8, 2000)).

These factors have already been adequately considered by the Court in evaluating Class Counsel's fee request.  In short, while the Court acknowledges that compensation was no sure thing for Class Counsel from the outset, any thought of increasing Class Counsel's award for bringing a suit that risked non-payment is overcome by the need to avoid a windfall award that exceeds the value of the benefits to Class Members and unduly incentivizes the prosecution of such claims in the future.  Therefore, the Court finds that no lodestar multiplier is necessary in this case.

**2. Expenses**

Fee awards include reasonable out-of-pocket expenses incurred by attorneys that are ordinarily charged to their clients.  LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998).  Class Counsel seeks reimbursement for $183,898.87 in expenses.

Although the Court is troubled by the lax documentation of expenses, particularly with respect to nearly $65,000 in expert and consultant fees, (Fairness Hearing Tr. 43-46), overall, the Court does not find that the requested expenses are excessive given the number of years that the case has been actively litigated.  Unlike attorneys' fees which were presented at current hourly rates, actual expenses do not account for the time value of money.  Therefore, in balancing Class Counsel's sparse documentation against the inconvenience of fronting their expenses for several years, the Court awards the full reimbursement of the submitted expenses.

**3. Incentive Awards for Representative Plaintiffs Parker and DeBrauwere**

Class Counsel seeks awards of $2,500 each for the Representative Plaintiffs for the time they expended in initiating and monitoring the lawsuit, producing documents, testifying at depositions and approving the settlement.  (2008 Fee Mem. 13.)  The Notice stated, "Time Warner Cable also has agreed to pay the two Class Representatives $2,500 each for their participation in this case on behalf of all Class Members."  (Notice 5.)  Given the minimal amount of the awards, the time and effort the Representative Plaintiffs expended in bringing this suit on behalf of the Class, and the fact that the awards were raised in the Notice, the Court approves them.

**4.  Class Counsel's attorneys' fees as a percentage of the Settlement Value**

Having arrived at a lodestar figure, an expense award and plaintiff incentive awards, the

Court can now add together all of the elements of the Settlement Value to evaluate the attorneys'

fees as a percentage of the recovery.  The court estimates the value of the claims made to be

$6.75 for each claim multiplied by the number of claims, estimated at 550,000, for a figure of

$3,712,500.  Add to this the cy pres award of $500,000, attorneys' fees of $3,301,573,

administrative costs of approximately $3,000,000, expenses of $183,899 and incentive awards

totaling $5,000.  This results in a fund of $10,702,972.  The adjusted lodestar of $3,301,572.97

represents 30.85% of the fund, a figure, though substantially less than Class Counsel's negotiated

fee, at the high end of recent percentage awards in this circuit.  Farinella v. PayPal, No. 05 Civ.

1720 (ILG), 2009 WL 1211912 (E.D.N.Y. Apr. 30, 2009) (Glasser J.) ("a review of 2008 district

court decisions in this Circuit applying the Goldberger factors, places attorneys' fees of 28% at

the high end of the spectrum") (collecting cases).

In consideration of the foregoing, applying both the lodestar method and the percentage

method, the Court finds that $3,301,572.97, constituting approximately 30.85% of the Settlement

Value, is a reasonable attorneys' fee for Class Counsel.

**F.  Objectors' Counsel Fees and Expenses and Objector Incentive Awards**

"[O]bjectors have a valuable and important role to perform in preventing collusive or

otherwise unfavorable settlements, and . . . they are entitled to an allowance as compensation for

attorneys' fees and expenses where a proper showing has been made that the settlement was

improved as a result of their efforts."  White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974).

"Ordinarily, the trial judge has broad discretion in deciding whether, and in what amount,

attorneys' fees should be awarded, since he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery."  Id.

The Loburs' Counsel requests $861,652 in attorneys' fees, $7,903.46 in expenses and incentive awards of $2,500 each for objectors Rick and Sharon Lobur.  (Memorandum of Law in Support of Lobur Objectors' Motion for Incentive and Attorneys Fees and Costs dated Nov. 24, 2008 ("Lobur Fee Mem."), 16, 20.)  The Witman firm requests $73,084 in attorneys' fees, $2,313.11 in expenses and incentive awards of $2,500 each for objectors Townsend and Vitrano. (Objectors Vitrano and Townsend Petition for Incentive Awards, and Attorneys Fees and Expenses dated Nov. 20, 2008 ("Witman Fee Mem."), 6.)  Any objector fees, expenses and awards authorized by the Court will be paid by Class Counsel.  (Settlement Agreement ¶ 26.) Class Counsel opposes the award of attorneys' fees and expenses for the Objectors' counsel and the proposed incentive awards for the Objectors.

## 1.  Objectors Rick and Sharon Lobur

The Loburs' written objection and oral presentation at the May 2006 fairness hearing were helpful to the Court in assessing and improving the settlement.  The Loburs made two notable contributions to the Court's consideration of the Prior Agreement.  First, the Loburs shed light on the disparate benefits available to different groups of Class Members in the settlement and were the originators of the Category I-IV framework that was first adopted by the Court in the 2007 Order.  Second, the Loburs challenged the notice program of the Prior Agreement which only sent direct mail notice to current subscribers, the Category I Class Members.  The Loburs' objection led to the Court's decision to require the parties to attempt to obtain current

addresses for the Category II and Category III Class Members, and provided additional impetus for the renegotiation of the settlement to provide for a cash award.

The utility of their participation notwithstanding, the immodesty of the Loburs' Counsel's fee petition is astonishing. First, the Loburs' Counsel's conception of the scope of the changes attributable to their objection is exaggerated to say the least. For example, they assert that "5.8 million additional Class Members will receive individual mailed notice of the settlement as a direct result of the objections raised by the Objectors/Intervenors that were upheld by the Court." (Lobur Fee Mem. 12.) While the updating of old addresses through the NCOA, combined with the culling of names from additional iterations of the LSDB, resulted in the confirmation of a few hundred thousand additional addresses, of the 5.8 million additional Class Members notified, nearly 5.5 million of those notifications were sent as postcards to old addresses that could not be verified. The Loburs' expert's claim that the list of subscribers could be made 90% accurate was clearly wrong.[32]

Even more audacious is the Loburs' Counsel's estimate of the monetary value of their contribution. "[I]t is clear that the value of benefits Objectors/Intervenors and their counsel conferred upon the class ranges from $43 million to $81 million . . . ." (Lobur Fee Mem. 10.) While their arithmetic does not bear repeating, it suffices to say that the Loburs' Counsel would like to take credit for each and every claim that could be conceivably be made by a Category I, II or III Class Member, whether or not such claims were in fact made.

---

[32]     The Court read with amusement the Loburs' Counsel's assertion that "[t]here is no way that the Court could have reasonably been expected to sift through all of the papers filed by the Parties in connection with the Initial Settlement, and conduct its own independent investigation, in order to evaluate whether the Initial Settlement was fair, reasonable, and adequate, as required by Fed. R. Civ. P. 23." (Loburs' Counsel Fee Mem. 15.) Counsel's audacious conclusion that something akin to divine inspiration informs the judge's determination whether a settlement is fair, reasonable and adequate is one this Court roundly rejects.

In recognition of their contributions, the Loburs' Counsel seek an award of attorneys' fees of $861,652 which they describe as a mere 1.4% to 3% cut of the value of the improvements their efforts bestowed upon the settlement, depending upon whether those improvements are valued at $29 million or $61 million.  (Lobur Fee Mem. 20.)  In estimating the value of all of the claims made at approximately $3.7 million, the Court has a less expansive view of the magnitude of their contribution.

The Loburs' Counsel calculates a lodestar of $195,830 based on 418.5 hours billed for an average hourly rate of $467.93.  (Lobur Fee Mem. 19.)  In addition, they seek a multiplier of 4.4 in consideration of the results achieved and the contingent nature of the fee, for a total fee request of $861,652, or $2,059 per hour.  The Court considers 418.5 hours to be excessive.  In essence, the Loburs' Counsel read the relevant documents, contacted Class Counsel to suggest improvements to the notice program and benefits provisions without success, drafted a memo articulating their concerns, obtained a statement from a purported expert regarding the notice program and made some appearances before the Court.  For these actions, the Court believes that half of the proffered hours would be adequate and accordingly reduces the lodestar to $97,915. The Loburs' memorandum of law and appearances at trial assisted the Court in its reconsideration of aspects of the Prior Agreement that it had preliminarily approved.  For this, the Court awards the Loburs' Counsel with total fees of $97,915.  The Court regards this amount as generous and therefore finds that a multiplier is unnecessary.  Requested expenses of $7,903.46 are also granted.

The Loburs' Counsel seeks incentive awards of $2,500 each for Rick and Sharon Lobur. "The amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." Park v. Thomson

Corp., 05 Civ. 2931 (WHP), 2009 WL 1160172, at * 4 (S.D.N.Y. Apr. 2, 2009) (quoting Fears v.

Wilhelmina Model Agency, Inc., No. 02 Civ. 4911 (HB), 2005 WL 1041134, at *3 (S.D.N.Y.

May 5, 2005)).  There is no indication that the Loburs themselves were put at risk or

inconvenienced in any meaningful way by lending their names to the objections pursued by their

counsel.  Incentive awards for objectors Rick and Sharon Lobur are therefore denied.

## 2.  Objectors Townsend and Vitrano

The submissions and presentations of the Witman Firm, counsel for objectors Townsend

and Vitrano also addressed the issue of the absence of consideration for former subscribers not

appearing on the 1999 LSDB, but did not raise concerns about the notice.  While the substance

of the Townsend and Vitrano objection was similar to that of the Loburs', it was filed about two

months after the Loburs' objection and within two to three weeks of the fairness hearing.  The

papers, while adequately presented, added nothing to the substance of the Loburs' written

objections and oral presentation.  In the end, the objections of Townsend and Vitrano are fairly

characterized as a nothing more than a standard request for more compensation to the Class

Members which came in the wake of a more effective objection by the Loburs.  The Townsend

and Vitrano objection also criticized the attorneys' fees sought by Class Counsel, but failed to

provide any new insights to the Court on this issue.  Therefore, all fees and expenses are denied

to Objectors Townsend and Vitrano and their counsel.

## III. Conclusion

For the foregoing reasons, the Court grants certification to the Class and approves the Settlement Agreement as fair, reasonable and adequate.  Class Counsel is awarded attorneys' fees in the amount of $3,301,572.97, or approximately 30.85% of the Settlement Value, and reimbursement of reasonable expenses in the amount of $183,898.87.  Representative Plaintiffs Parker and DeBrauwere are awarded incentive awards in the amount of $2,500 each.  The Loburs' Counsel are awarded attorneys' fees in the amount of $97,915 and reimbursement of reasonable expenses in the amount of $7,903.46.  Incentive awards for objectors Rick and Sharon Lobur are denied.  The Witman Firm is denied attorneys' fees and expenses and incentive awards for objectors Townsend and Vitrano are denied.

The Court hereby directs entry of final judgment, consistent with this Memorandum and Order.

SO ORDERED.

Dated: Brooklyn, New York
         July 6, 2009

_____/s/_____
I. Leo Glasser
United States Senior District Judge

**Copies of the foregoing memorandum and order were electronically sent to:**

Counsel for the Plaintiffs

Daniel Hume
Kirby McInerney LLP
825 Third Avenue
New York , NY 10022

Michael G. Lenett
Cuneo Waldman & LaDuca, LLP
507 C Street, N.E. 20002
Washington, DC 20002

George W. Sampson
Hagens Berman LLP
1301 Fifth Avenue
Suite 2900
Seattle , WA 98101

Counsel for the Defendants

Jonathan D. Thier
Cahill Gordon & Reindel, LLP
80 Pine Street
New York, NY 10005

Landis Cox Best
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005

Counsel for Objectors Rick and Sharon Lobur

A. Anderson B. Dogali
Forizs & Dogali, P.L.
4301 Anchor Plaza Parkway
Suite 300
Tampa , FL 33634

Daniel W. Anderson
The Anderson Law Firm, P.A.
POB 340381
Tampa, FL 33694-0381

Counsel for Objectors Lydia Townsend and Rosalie Vitrano

Steven B. Witman
Law Office Of Steven Witman
3850 N Causeway Blvd, Suite 1960
Metairie, LA 70002